**Electronically Filed
Supreme Court
SCAP-13-0002896
17-MAR-2015
09:32 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

In the Matter of the Tax Appeal of TRAVELOCITY.COM, L.P.,
Petitioners and Respondents/Appellees-Cross-Appellants,

vs.

DIRECTOR OF TAXATION, STATE OF HAWAI'I,
Respondent and Petitioner/Appellant-Cross-Appellee.

SCAP-13-0002896

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(T.A. NO. 11-1-0021 AND CONSOLIDATED CASES:
11-1-0022, 11-1-0023, 11-1-0026, 11-1-0027, 11-1-0029,
11-1-0030, 11-1-0031, 11-1-0032, 11-1-0033, 12-1-0287,
12-1-0288, 12-1-0289, 12-1-0292, 12-1-0293, 12-1-0294,
12-1-0295, 12-1-0297, 12-1-0299, and 12-1-0300)

March 17, 2015

RECKTENWALD, C.J., NAKAYAMA, McKENNA, AND POLLACK, JJ., AND
CIRCUIT JUDGE LEE, IN PLACE OF ACOBA, J., RECUSED

OPINION OF THE COURT BY POLLACK, J.

I.    INTRODUCTION

This case considers whether the General Excise Tax

(GET) and the Transient Accommodations Tax (TAT) are assessable

on the relevant income of commercial entities operating under business models that were not expressly considered by the legislature when the applicable GET and TAT statutes were originally enacted.  The Director of Taxation, State of Hawai'i (Director) retroactively assessed ten online travel companies for unpaid GET and TAT for periods beginning between 1999 and 2001 and continuing until 2011, plus applicable penalties.

The online travel companies appealed the assessments to the Tax Appeal Court (tax court), and the assessments were consolidated into the present case.  Both the online travel companies and the Director moved for summary judgment.  The tax court ruled in favor of the Director with regard to the assessment of the GET (GET Assessments), with penalties and interest, but ruled in favor of the online travel companies with regard to the assessment of the TAT (TAT Assessments).[1]  That disposition was reflected in the tax court's Final Judgment Disposing of All Issues and Claims of All Parties (Final Judgment), from which the online travel companies and the Director seek review.

---

[1]     The Director sought interest and penalties with regard to both the GET and TAT Assessments.  The penalties were a 25% "failure to file" penalty, pursuant to Hawai'i Revised Statutes (HRS) § 231-39(b)(1) (Supp. 1994), and a 25% "failure to pay" penalty, pursuant to HRS § 231-39(b)(2). Interest on unpaid tax is assessable pursuant to HRS § 231-39(b)(4).  As the tax court found that the online travel companies were not liable for the TAT, the court rejected interest and penalties as to the TAT Assessment.

We affirm the Final Judgment in part and vacate in part in regard to the GET Assessments, affirm in regard to the TAT Assessments, and remand the case to the tax court for further proceedings consistent with this opinion.

## II.    BACKGROUND

In early 2011 and 2012, the Director made multiple retroactive assessments against Expedia, Inc.; Hotels.com, L.P.; Hotwire, Inc.; Travelocity.com LP; Site59.COM, LLC; Orbitz, LLC; Trip Network, Inc.; Internetwork Publishing Corp.; priceline.com, Inc.; and Travelweb LLC (collectively the Online Travel Companies or OTCs, sometimes individually OTC). The OTCs appealed the 2011 and 2012 assessments to the tax court and the appeals were consolidated. All the non-dismissed assessments are consolidated in the present case, and the amounts that would be subject to the GET and TAT Assessments are stipulated.[2]

As noted, the Director and the OTCs both moved for summary judgment, resulting in the Final Judgment. The Final Judgment was filed "pursuant to and consistent with" eight underlying orders.[3] In the Director's appeal, the Director

---

[2]    The Director's retroactive assessment of the GET to the operations of the OTCs resulted in collective taxes and penalties of approximately $247 million. The Director's assessment of the TAT to the same operations of the OTCs that was rejected by the tax court would have assessed approximately $430 million in taxes and penalties.

[3]    Five of the orders addressed the GET Assessments:

(continued. . .)

identifies as error the tax court's grant of summary judgment in favor of the OTCs in regard to the TAT Assessments, the denial of summary judgment in favor of the Director on the TAT Assessments, and the denial of the Director's motion for reconsideration.[4]

In their cross-appeal, the OTCs identify the following as error: the tax court's grant of summary judgment in favor of

---

(. . .continued)

    (1)    Order Denying [OTCs'] Motion for Partial Summary Judgment on [GET] Assessments, filed February 8, 2013;

    (2)    Order Granting in Part and Continuing in Part [Director's] Motion for Partial Summary Judgment on [GET] Assessments, filed February 8, 2013;

    (3)    Order Denying [OTCs'] Motion for Reconsideration of the Order Granting in Part and Continuing in Part [Director's] Motion for Partial Summary Judgment on [GET] Assessments, Entered February 8, 2013, filed April 1, 2013;

    (4)    Order Granting [Director's] Motion for Partial Summary Judgment on [GET] Assessments; Schedules 1-4, filed August 15, 2013; and,

    (5)    Order Granting [Director's] Motion for Partial Summary Judgment on Statutory Interest on Statutory Penalties, filed August 15, 2013.

        Three orders addressed the TAT Assessments:

    (6)    Order Granting [OTCs'] Motion for Partial Summary Judgment on [TAT] Assessments, Filed on August 31, 2012, filed February 8, 2013;

    (7)    Order Denying [Director's] Motion for Partial Summary Judgment, Filed on August 31, 2012, filed February 8, 2013; and,

    (8)    Order Denying [Director's] Motion for Reconsideration Filed November 7, 2012, filed February 8, 2013.

    [4]    Additionally, the Director cites as error the tax court's determination that the TAT does not apply to the OTCs on the gross rental proceeds derived from certain transactions with Hawai'i hotels, "without any deductions whatsoever."

the Director in regard to the GET Assessments, the court's denial of reconsideration of that grant, and the court's affirmance of penalties on the GET Assessments.[5]

This opinion will first provide the factual background common to both appeals. Following the background, the discussion will then address the separate appeals: the cross-appeal by the OTCs in regard to the GET Assessments, followed by the appeal by the Director in regard to the TAT Assessments.

### A.    The Assessed Transactions

The OTCs are organizations doing business with Hawai'i hotel guests (transients) and Hawai'i hotels. They operate websites where transients can research their destinations, compare travel options, and make reservations with third-party travel suppliers such as airlines, car rental companies, and hotels. The OTCs do not own any hotels.

The OTCs sell room accommodations using a business model that involves two different types of contracts: in the first, the hotel grants the OTC the right to sell occupancy of a hotel room to a transient, and in the second, the right to occupy the hotel room is sold to the transient by the OTC. The

---

[5]    The OTCs do not identify as error the tax court's order granting interest on the penalties or the court's denial of summary judgment in their favor on the GET Assessments.

Director's GET and TAT Assessments are on transactions made under this business model (Assessed Transactions).[6]

### 1.    The OTC-hotel contracts

In a contract between an OTC and a hotel, the hotel grants the OTC the right to offer room occupancy to the public out of the hotel's inventory.  The hotel contractually delegates to the OTC numerous "day-to-day" responsibilities the hotel would otherwise perform itself, including the marketing, pricing, tax collecting, payment processing, legal contracting, accounting, and customer service functions.  The OTCs maintain that they do not have the right or the ability to control or take possession of any hotel rooms; they do not buy, resell, or rent rooms or blocks of rooms; and they bear no risk if they fail to arrange room reservations at any hotel.

The OTC-hotel contract establishes the rate the hotel will charge the OTC for a room (net rate).  The net rate is typically not a fixed amount, but floats, based on a discount from the hotel's "best available rate" offered to the public.

An OTC independently sets the price the transient is charged for the room based on the net rate under the OTC-hotel

---

[6]     The OTCs also enter into transactions that the OTCs refer to as "agency model transactions" and the Director refers to as "Hotel-Controlled Sales," in which the OTCs operate as a "traditional travel agent."  "Agency model transactions" or "Hotel-Controlled Sales" are not at issue in this case.

contract.  That room price is made up of the net rate, plus two other elements set by the OTC: a "mark up" and a "service fee."  The mark-up added to the net rate equals the "retail rate" the OTCs charge the transient for the room.  In addition to the mark-up, the OTCs charge transients a service fee.  The OTCs set the amount of the service fee.

### 2.   The OTC-transient contracts

An OTC enters into a contract with a transient that reserves the transient's right to occupy a hotel room for a certain period of time.[7]  In the Assessed Transactions, transients obtain the right to occupy those hotel rooms by transacting with the OTCs rather than with the hotels themselves.  The OTC-transient contract may also include terms and conditions of the hotel.[8]

The OTC controls significant aspects of the relationship with the transient from the time the transient logs on to the OTC's website until the transient checks in at the hotel.  For instance, it is typical that prior to check-in, the only contact the transient has regarding the hotel reservation

---

[7]    The parties appear to use the term "reservation" as synonymous with "paid reservation" to describe the booking made by the transient for the right to occupy a hotel room for a certain period of time.

[8]    The Director asserts that there is no written contract between the transient and the hotel.  The answering brief of the OTCs did not dispute this assertion; however, the declaration of a Travelocity.com LP employee indicated that on "arrival at the hotel for check-in, the traveler will be asked to . . . sign the hotel's agreement and/or registration card."

is with the OTC.  Prior to check-in, the transient is considered to be solely the OTC's customer.  Once the transient accepts the OTC's contract terms, the OTC processes the credit card transaction as the merchant of record.  The transient pre-pays the OTC in full when the right to occupy a hotel room for a certain period of time is reserved.  The transient owes nothing to the hotel at check-in.

The OTC does not disclose the individual amount of the net rate, mark-up, service fee, or tax to the transient.  In the invoice to the transient, the OTC combines the taxes and service fees into a single line item called "taxes and fees." Similarly, the OTC never discloses to the hotel the amount of the mark-up, service fee, or total price paid by the transient. Only the OTC knows all the individual amounts comprising the total price paid by the transient, including the net rate, mark-up, service fee, and taxes.

Upon completing the reservation, the OTC sends an invoice or email confirmation to the transient.  The hotel does not confirm the reservation directly with the transient.  The OTC has its own cancellation policies the transient must accept when the booking occurs.  If the transient changes or cancels a reservation, the OTC handles the change or cancellation.  After booking the reservation, the OTC provides continuing customer

support to the transient.  The OTCs bear the risk of loss from credit card fraud or bad debt.

In the Assessed Transactions, the OTCs collect the room charge and taxes from the transients and control the monies paid by the transients.  The hotels contractually delegate to the OTCs the responsibility to collect all amounts, including taxes, from the transients.  The OTCs thus collect all amounts from the transient at the time the transient makes the reservation with the OTC.

The hotel invoices the OTC for the hotel stay, typically after the transient has checked out.  Pursuant to the hotel's invoice, the OTC pays the hotel the net rate and the tax (TAT and GET) that has been collected from the transient on the net rate.  The OTC is not an occupant and does not obtain a right of hotel room occupancy.  The transient is the occupant and obtains a right to room occupancy, but the transient is not a party to the payment of the net rate by the OTC to the hotel.

**B.  Contact between the parties and actions of the parties prior to the 2011 Assessments**

The parties dispute the import and extent of prior knowledge and prior contacts of the parties in regard to the OTCs' potential tax liability for the GET and TAT on the Assessed Transactions.  The actions and contacts of the parties

prior to the 2011 Assessments that can be garnered from the record are included here.

Attorney-client privilege logs in the record indicate some OTCs were in discussions with their counsel regarding "excise tax," "hotel occupancy taxes," and "state tax accrual" from 2001.

The record contains an email dated April 7, 2004, from an ostensible employee of the State of Hawai'i to a person apparently involved in the state government of Florida that indicated that Hawai'i could not "impose our TAT on an internet company's retained portion of payment for a hotel rental."[9]

In June 2006, the record indicates that members of the Department of Taxation (Department) convened an internal meeting to discuss the issue of taxing OTCs.[10]

In March 2007, employees of the Department met with a representative from one of the OTCs. A member of the Department testified that the conclusion reached at the meeting was "the Department was not going to pursue a case at that time," and that conclusion was "probably communicated" to the OTCs' representative. A declaration by the OTCs' representative

---

[9] The OTCs maintain that the email was written by a Hawai'i Department of Taxation Administrative Rules Specialist responding to an inquiry from the Florida Department of Revenue. The record does not indicate when the OTCs first became aware of this email.

[10] The record does not indicate when the OTCs first became aware of the 2006 meeting.

confirms that the meeting took place. The representative testified that he was informed that "we were certainly not subject to TAT" but "we may be subject to a GET or use tax." Testimony by former Department Director Kurt Kawafuchi (Director Kawafuchi) does not contradict this assessment of the meeting and suggests that the Department may have invited a request for a private letter ruling that the OTCs did not owe the TAT. The OTCs did not request such a ruling.

In 2008, the Department began investigating the potential assessment of the GET and TAT against the OTCs. In May 2008, the Director sent information requests to the OTCs for transactional data.

In July 2008, a meeting was held involving the Governor's office and representatives from the Department and the OTCs. Another meeting involving representatives of the OTCs and the Department's outside counsel took place in August 2008. On August 21, 2008, the OTCs were apparently informed that the Department's requests for transactional data were on hold pending a request to the OTCs for information regarding tax litigation in other jurisdictions. The OTCs were informed that the Director's review of the litigation materials would take some time and that there was no expectation for the OTCs to provide the transactional data as long as the OTCs were in discussion with the Department.

In 2008, however, the matter was dropped. Director Kawafuchi testified that the matter ultimately was elevated to the Governor's level and the "Governor decided not to pursue a case." The OTCs' representative declared he spoke with Director Kawafuchi in November 2008 and was informed that the TAT inquiry would not go forward. The OTCs' representative also declared that it was communicated to him that "the recommendation that the Department not go forward was unanimous among members of [the Department] leadership team" and that the Governor "had decided that the State would not pursue the [TAT] matter against the OTCs." The representative further declared that the Department would "get back" to him regarding a possible GET audit but that the Department "never contacted" him.

In a letter dated October 9, 2009, the Attorney General of the State of Hawai'i (Attorney General) responded to a request from the Senate President and the Speaker of the House relating to OTCs and the Hawai'i GET and TAT (2009 Attorney General Letter).[11] The letter stated that the Department "determined that it did not wish to pursue and would not support litigation against the OTCs." The reasons provided in the letter for that determination were that the TAT "did not apply to [OTCs] because the OTCs are not operators" and the GET "would

_____

[11] The record does not indicate when the OTCs became aware of the October 9, 2009 letter to the Senate President and the Speaker of the House.

probably also not be applicable due to the sourcing of the income outside of Hawaii."  "In addition, the [Department] believed it may have had substantial litigation hazards in showing that the majority of OTCs had sufficient presence in Hawaii to establish substantial nexus as a prerequisite to the imposition of state taxes."

Director Kawafuchi, who was copied on the letter, testified that he did not write the letter and could not remember if he reviewed it before it went out.  Director Kawafuchi testified that he disagreed with the letter's conclusion that the Department may have difficulty proving that the OTCs had sufficient presence in Hawai'i to establish constitutional nexus; he testified that the OTCs "have nexus in the State of Hawaii."

On October 13, 2009, the Rules Office of the Department prepared a memorandum to file that concluded that the OTCs were not subject to the TAT because they are not operators and the Department was not likely to succeed in assessing the OTCs for the GET because current Hawai'i nexus and sourcing laws are uncertain.[12]

The Director suggests that some of the conclusions generated by the Department between 2007 and 2009 were due to

_____

[12]     The record does not indicate when the OTCs became aware of the October 13, 2009 memorandum to file.

misrepresentations by the OTCs. The voluminous sealed records that provide factual support for the Director's assessment of the Assessed Transactions were not available to the Director when the Department initially considered taxing the OTCs in 2007 through 2009. The implication from the Director is that the Department's current position is the result of the information that was gathered during pretrial discovery relating to this case.

### C.    Standards of review

This court reviews an award of summary judgment de novo, under the same standards applied by the trial court. Therefore, "summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fujimoto v. Au, 95 Hawaiʻi 116, 136, 19 P.3d 699, 719 (2001) (alteration omitted) (quoting Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 104, 839 P.2d 10, 22 (1992)).

Where the appeal is from the Tax Appeal Court, it is well settled that, in reviewing the findings of fact, "a presumption arises favoring its actions which should not be overturned without good and sufficient reason. The appellant has the burden of showing that the decision of the Tax Appeal

Court was 'clearly erroneous.'"  Weinberg v. City & Cnty. of

Honolulu, 82 Hawai'i 317, 322, 922 P.2d 371, 377 (1996); see

Kamikawa v. United Parcel Serv., Inc., 88 Hawai'i 336, 338, 966

P.2d 648, 650 (1998).  When the facts are undisputed and the

sole question is one of law, the decision of the Tax Appeal

Court is reviewed "under the right/wrong standard."  Kamikawa,

88 Hawai'i at 338, 966 P.2d at 650 (quoting Weinberg, 82 Hawai'i

at 322, 922 P.2d at 377).

### III.    DISCUSSION OF THE GET ASSESSMENTS

### A.    Introduction

The GET is imposed by Hawai'i Revised Statutes ("HRS")

Chapter 237; HRS § 237-13 provides as follows:

> There is hereby levied and shall be assessed and collected
> annually privilege taxes against persons on account of
> their business and other activities in the State measured
> by the application of rates against values of products,
> gross proceeds of sales, or gross income, whichever is
> specified, as follows:
>
> . . .
>
>     (6)    Tax on service business.
>
>         (A)    Upon every person engaging or continuing within
>             the State in any service business or calling
>             including professional services not otherwise
>             specifically taxed under this chapter, there is
>             likewise hereby levied and shall be assessed
>             and collected a tax equal to four per cent of
>             the gross income of the business . . . .

HRS § 237-13 (Supp. 1999) (emphases added).  A service business

"includes all activities engaged in for other persons for a

consideration which involve the rendering of a service,

including professional services, as distinguished from the sale

of tangible property or the production and sale of tangible property."  HRS § 237-7 (Supp. 1999) (emphasis added).[13]  Gross income includes rental income.  HRS § 237-3 (1993).[14]  Thus, the GET is imposed on the gross income derived from the sale of services or rental income resulting from all services activities that occur within the state.

      **B.**    **The tax court's statements regarding the GET**

      At the summary judgment hearing, the tax court found that the GET applied to gross income resulting from the Assessed Transactions and granted the Director's motion for summary

---

[13]     HRS § 237-7 defines "Service business or calling" as including

     all activities engaged in for other persons for a consideration which involve the rendering of a service, including professional and transportation services, as distinguished from the sale of tangible property or the production and sale of tangible property.  "Service business or calling" does not include the services rendered by an employee to the employee's employer.

[14]     HRS § 237-3 defines "Gross income" and "gross proceeds of sale":

     "Gross income" means the gross receipts, cash or accrued, of the taxpayer received as compensation for personal services and the gross receipts of the taxpayer derived from trade, business, commerce, or sales and the value proceeding or accruing from the sale of tangible personal property, or service, or both, and all receipts, actual or accrued as hereinafter provided, by reason of the investment of the capital of the business engaged in, including interest, discount, rentals, royalties, fees, or other emoluments however designated and without any deductions on account of the cost of property sold, the cost of materials used, labor cost, taxes, royalties, interest, or discount paid or any other expenses whatsoever.

HRS § 237-3 (1993) (emphases added).

judgment as to the assessment of the tax.[15]  The tax court found that the GET is a tax upon the privilege of engaging in business activity in this state.  The tax court reasoned that the Director may levy the GET upon "the privilege of engaging in a very lucrative business activity that exists and thrives upon Hawaiian transient accommodations."

The court next considered whether the OTCs' GET liability would be affected by HRS § 237-18(g) (GET Apportioning Provision).  The GET Apportioning Provision states:

> Where transient accommodations are furnished through arrangements made by a travel agency or tour packager at noncommissioned negotiated contract rates and the gross income is divided between the operator of transient accommodations on the one hand and the travel agency or tour packager on the other hand, the <u>tax imposed by this chapter shall apply to each such person with respect to such person's respective portion of the proceeds, and no more</u>.

HRS § 237-18(g) (1993) (emphasis added).  Applicability of the GET Apportioning Provision to the Assessed Transactions would result in the OTCs and the hotels each being responsible for GET assessment upon their respective portion of the proceeds, rather than the liability of the OTCs being based upon the entire proceeds paid by the transient to the OTCs.

The tax court found that the OTCs' revenues from the Assessed Transactions are combined and collected in a single

---

[15]    The tax court elected not to make any findings of fact or conclusions of law, pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 52(a).

payment that includes the net rate, services charges, mark-up, and taxes, and the court also found that the OTCs only remit to the hotel a portion of the payment after retaining a mark-up and a service fee. The court ruled that "if there is an increase or expansion of the cost so there is a markup or some other cost that is added to a particular product," then the entire amount becomes subject to the GET. Accordingly, the court determined that the entire payment from the transient customer to the OTC is subject to the GET. Thus, the tax court concluded that the Assessed Transactions did not fall within the GET Apportioning Provision.

Consequently, the tax court granted summary judgment in favor of the Director in regard to the GET Assessments and the application of statutory interest. The tax court filed a minute order that explained the court's rationale in affirming the Director's determination that both a "failure to file" and a "failure to pay" penalty applied to the GET Assessments.

As to the failure to file a tax return, the tax court found that the OTCs did not introduce any evidence that Hawai'i law or Department guidance failed to put them on notice that they were required to file GET returns and no evidence that any

OTC taxpayer was advised by a tax advisor or attorney that it was not required to file a return.[16]

Second, the court found that the OTCs failed to demonstrate a subjective belief that they did not need to file GET returns and also failed to introduce any evidence into the record that any OTC was aware that the Department agreed that the OTCs were not required to file GET returns. To the contrary, the court noted that an OTC attorney testified that former tax Director Kurt Kawafuchi indicated that the OTCs may have GET liability. As such, the court found that "the [OTCs] are charged with the same knowledge as their [attorney]."

Third, the court found no evidence that the OTCs were aware of the 2009 Attorney General Letter. Accordingly, the court affirmed the Director's assessment of the failure to file penalty.

The tax court next discussed its affirmance of the Director's assessment of the failure to pay penalty. The tax court rejected the OTCs' argument that the Director was personally required to make an affirmative finding of negligence or intentional disregard of the law in order to apply the

---

[16] The OTCs asserted the attorney-client privilege on certain matters in regard to the application of penalties on the GET Assessments. The court noted that it did not draw any inference from the OTCs' assertion of the attorney-client privilege, but the court declined to rule on the validity of that assertion.

failure to pay penalty.  The tax court found that it was sufficient that the Director delegated the responsibility of making such a finding and that such delegation was evident in the fact that the penalty was assessed.

### C.    The parties' GET arguments on appeal[17]

The OTCs appeal the tax court's grant of summary judgment in favor of the Director on the issue of the OTCs' liability for the GET, the court's denial of reconsideration of that grant, and the court's affirmance of penalties on the GET Assessments.

### 1.    The OTCs' arguments regarding the GET Assessments

The OTCs argue that the GET only applies to revenue generating activities within the State of Hawaiʻi and their activities do not occur in Hawaiʻi; that their services are not used or consumed in Hawaiʻi; that if the GET applies to the Assessed Transactions, then the GET Apportioning Provision also applies; and that rules of statutory interpretation indicate that any ambiguity in the GET Apportioning Provision must be construed in their favor.

---

[17]    Both parties used extensive emphases in their briefs, and multiple types of emphases were used (e.g., underlining, bold, italics, bold italics, underlined bold italics).  Therefore, in the sections summarizing the parties' briefs in both the GET and TAT appeals, removed emphases will not be indicated.

### a. The OTCs argue the GET applies only to revenue-generating activities performed "in the State"

The OTCs argue that the Assessed Transactions are not subject to the GET tax because the GET applies only to revenue-generating business activities performed "in the State" and their activities do not occur within Hawai'i. The OTCs contend that the "in the State" limitation within the GET refers to the "physical, geographical location" where "the particular activity" that generates income is performed. The OTCs further contend that "this Court never has held an out-of-state business liable for GET on income generated by activity performed outside of the territorial limits of Hawai'i."

The OTCs cite first to this court's decision in In re Tax Appeal of Grayco Land Escrow, Ltd., 57 Haw. 436, 449, 559 P.2d 264, 266 (1977), for the holding that the GET "is measured . . . by the income realized by the particular activity engaged in by the taxpayer within the state." The OTCs next point to In re Tax Appeal of Baker & Taylor, Inc., 103 Hawai'i 359, 82 P.3d 804 (2004), in which the OTCs maintain that this court held a "mainland company liable for GET on books it sold and delivered to customers in Hawai'i." Third, the OTCs contend that In re Tax Appeal of Heftel Broadcasting Honolulu, Inc., 57 Haw. 175, 554 P.2d 242 (1976), upheld the assessment of the GET against a mainland company that rented films to a Hawai'i broadcaster

because "the presence and rental of CBS' films in Hawai'i constituted 'economic activity' sufficient to meet the 'instate business activity' requirement of the statute."  Lastly, the OTCs rely on In re Tax Appeal of Subway Real Estate Corp. v. Director of Taxation, 110 Hawai'i 25, 39, 129 P.3d 528, 542 (2006), in which a mainland company was held liable for the GET on its activities of "'signing and maintaining the leases and subleases for each Subway shop' in Hawai'i, from which it derived economic benefit."

Particularly, as to service businesses, the OTCs argue that in each case, this court has held that the GET applies only to services the putative taxpayer has performed "in the State." The OTCs contend that in Ramsay Travel, Inc. v. Kondo, 53 Haw. 419, 495 P.2d 1172 (1972), this court upheld the imposition of the GET on travel agencies because their business activity was conducted exclusively within the State of Hawai'i and the agencies were physically in Hawai'i.  The OTCs argue that in HC&D Moving & Storage Co. v. Yamane, 48 Haw. 486, 405 P.2d 382 (1965), this court upheld the GET against a Hawai'i taxpayer, noting that the taxpayer's activities were "performed entirely and solely within the State."

In further support of their argument, the OTCs refer to the Department's rules, which impose the GET on business and other activities of "every person engaging or continuing within

the State in any service business."  (Quoting Hawai'i

Administrative Rules (HAR) § 18-237-13-06.05(b)(1)).

The OTCs also cite to Tax Information Releases (TIRs),

guidance documents issued by the Department, in support of their

argument that "in the State" is a physical and geographic

limitation.  The OTCs claim that the TIRs make clear that a

travel agency performing its services <u>outside</u> Hawai'i is not

liable for the GET, even when the arranged travel occurs within

Hawai'i.  The OTCs assert that their argument is further

supported by a 1965 State Attorney General Opinion (1965 AG

Opinion).[18]

The OTCs argue that, by "concluding that the GET

reaches activities both in the State and outside the State, the

Tax Court stripped the 'in the State' limitation of any meaning,

improperly rendering it mere surplusage" and unconstitutionally

vague.  The OTCs further contend that interpreting a vaguely

constructed statute in favor of creating liability would violate

the principle that statutes imposing taxes must be construed in

favor of the taxpayer.

---

[18]    The OTCs argue that the 1965 AG Opinion suggests that a person contracting with or employed by a mainland travel agency that accompanies a tour group to Hawai'i is not subject to the GET because "the privilege of doing business is being exercised outside the [S]tate of Hawai'i, and that which is being done in Hawai'i is in aid or furtherance of the business being done outside Hawai'i."  The OTCs maintain that they are entitled to the same tax treatment as an out-of-state travel agency.

**b.    The OTCs argue that their services are not "used or consumed" in Hawai'i**

As an independent reason that the Assessed Transactions are not subject to the GET, the OTCs assert that the tax court erred in upholding application of the GET on services that are not used or consumed in Hawai'i, citing an exception for services exported out of the state under HRS § 237-29.53(a) and referencing the "Conformity to Constitution, Etc.," an exception established by HRS § 237-22(b).  The OTCs assert that their services are not consumed in Hawai'i, but rather, in whatever out-of-state location the transient is located at the time of purchase.

**c.    The OTCs argue that if the GET applies to the Assessed Transactions, the GET Apportioning Provision also applies**

The OTCs maintain that the GET Apportioning Provision was intended to eliminate the effect of "pyramiding" in certain circumstances.[19]  The OTCs assert that the GET Apportioning Provision "avoids multiple taxation on the same gross proceeds" when travel agents and tour packagers arrange room reservations on a noncommissioned basis.  Thus, the OTCs contend that even if they are liable for the GET, they are liable only for their

---

[19]    "Pyramiding" is an informal term referring to multiple tax assessments on different persons or entities on the same or related revenue and is an accepted feature of certain implementations of the GET.  See In re Tax Appeals of Busk Enters., Inc., 53 Haw. 518, 497 P.2d 908, 910 (1972); Subway, 110 Hawai'i at 34, 129 P.3d at 537.

"respective portion of the proceeds, and no more," because they are travel agents using noncommissioned negotiated contract rates. (Quoting the GET Apportioning Provision). The OTCs claim that the 1965 AG Opinion and the Department's documentation--including TIR 91-8, Announcement No. 2011-27, and published Department instructions for filing a GET return--confirm that even in-state travel agencies operating under the merchant model are liable for the GET only to their mark-up and no more.

The OTCs assert that although "travel agent" is not defined by the GET statute, they fall "squarely" within the definition of "travel agent" under HRS § 486L-1 as they act as "an intermediary between a person seeking to purchase travel services and any person seeking to sell travel services." Further, the OTCs maintain that they "have held themselves out as" and are "understood by the industry to be" travel agencies. The OTCs also contend that the transactions between the OTCs and the hotels are noncommissioned, and the rates at which hotels allow OTCs to arrange room reservations are negotiated between the hotels and the OTCs. Thus, the OTCs conclude that the Assessed Transactions fall within the GET Apportioning Provision.

The OTCs contest the tax court's two stated reasons for non-applicability of the GET Apportioning Provision. First,

the OTCs note that the "GET Statute expressly contains the anti-pyramiding provision, which necessarily means it applies in the general excise tax arena."  Second, the fact that the travel agency adds its own margin and service fee to the contractual net rate does not render the GET Apportioning Provision inapplicable.  The OTCs maintain that the tax court's ruling is "contrary to the plain language of the Statute and the Department's own guidance[] and improperly renders the anti-pyramiding provision a nullity."

### d.    The OTCs argue that any ambiguity in the GET Apportioning Provision must be resolved in their favor

The OTCs contend if the applicability of the GET Apportioning Provision is ambiguous, "where there are competing reasonable constructions, the resulting ambiguity must be strictly construed against the taxing authority and in favor of the asserted taxpayer."

### 2.    The Director's arguments regarding the GET Assessments

In response, the Director argues the following: (1) because the OTCs conduct "business and other activities in the State," they are subject to the GET; (2) there is no legal authority for the OTCs' "consumed or used" test; (3) the OTCs are not subject to the GET Apportioning Provision; and (4) the assessed penalties are correct in all respects.

a.    **The Director argues that the OTCs do business "in the State" and are thus subject to the GET**

The Director characterizes the GET as "a 'privilege tax' that is 'based on the fact that the party chose to engage in business activity within the state' and 'is justified on the ground that companies conducting business enjoy the protections and benefits given by the state.'"  The Director contends that the GET statute is especially broad in scope, evincing an intention to tax virtually every economic activity imaginable and virtually all transactions with economic gain or benefit. The Director contends that this court had upheld the application of the GET in analogous circumstances, citing to Grayco, Subway, Heftel Broadcasting, and Baker & Taylor.

b.    **The Director argues the OTCs must pay GET on their gross income without any deduction**

The Director contends the OTCs owe the GET on the total gross income from the Assessed Transactions without any deductions "whatsoever" because the OTCs have "independent GET obligations."  (Quoting HRS § 237-3(a)).  The Director argues that the GET Apportioning Provision does not apply to the OTCs because the provision requires three elements, "none of which are found in [the Assessed Transactions]."

First, the Director argues that the OTCs "are not functioning as travel agents" because they do not "act as [] intermediar[ies]," but rather, act as direct sellers of Hawaiʻi

hotel rooms to transients.  The Director contends that under the OTC-hotel contracts, Hawai'i hotels grant the OTCs control over their inventory and the right to offer room occupancy to the public.  "The contracts provide that the OTCs, not the hotels, control the relationship with the transients . . . ."  Transients "obtain the right to occupy those hotel rooms by transacting with the OTCs rather than with the hotels."  "The OTCs collect all amounts, including rent and taxes, from the transients when the transients make the reservation with the OTCs."  The Director argues that the fact that the OTCs are registered as travel agents under HRS § 468L-2 and hold themselves out as online travel agencies does not prove that the OTCs function as travel agents in the Assessed Transactions.

Second, the Director argues that in the Assessed Transactions, the gross income is not divided.  "Under the OTC-Hotel Contracts, OTCs pay hotels as they do any other creditor. The transient's payment to the OTCs is not 'pooled' or 'divided' with the hotel . . . ."  The Director contends that "the OTCs do not divide income with hotels by virtue of paying the hotels for room occupancy later sold to transients."  Thus, the Director concludes that "[r]ather than being in a legal relationship such as a partnership or joint venture where revenues are divided," the OTCs' relationship with the hotels is at "arm's length."

Third, the Director contends that the OTCs' income in the Assessed Transaction is not consistent with noncommissioned negotiated contract rates. The Director argues that the legislative history indicates that the GET Apportioning Provision "was added to address the legislature's concern that tour packages presented a unique problem in that it might be 'impossible' for the Director to determine what portion of the total package price is attributable to each travel component for tax purposes." The Director states that noncommissioned negotiated contract rates should only apply to agreements between a hotel and tour packager under which the hotel room price is set at a "fixed dollar amount" or a "sum certain." In contrast, the Director maintains that the OTC-hotel contracts involve room rates that are "'floating' 'net rate' amounts"; "the 'net rate' is a formula and the dollar amount fluctuates."

## D. The parties' arguments regarding interest and penalties on the GET Assessments

The tax court affirmed the Director's assessment of a 25% "failure to file" penalty and a 25% "failure to pay" penalty, authorized under HRS §§ 231-39(b)(1) and 231-39(b)(2)(A), respectively.

### 1. The OTCs' arguments regarding penalties

The OTCs argue that the failure to file penalty should not be imposed where the taxpayer proves its inaction was "due

to reasonable cause and not due to neglect." The OTCs argue Hawai'i case law does not limit reasonable cause to reliance on advice of a competent accountant or attorney. Further, the OTCs cite to federal case law for the proposition that "where the law is unsettled or ambiguous, such that it does not give notice of the requirement to file a return, the circumstances of the case speak for themselves and there is reasonable cause for failure to file as a matter of law." The OTCs represent that because they "voluntarily approached the Department to discuss potential liability," and because the former Director and Attorney General advised them that the Department had concluded the OTCs likely were not liable for GET, they had reasonable cause to not file GET returns.

In regard to the failure to pay penalty, the OTCs argue that the failure to pay penalty requires an affirmative determination by the Director that the failure to pay was due to negligence or intentional disregard of rules. The OTCs contend that there is no evidence that the Director made such a determination. With no support in the record, the OTCs contend that the failure to pay penalty is "baseless."

### 2. The Director's arguments regarding penalties

The Director asserts it is "indisputabl[e]" that the OTCs were on notice of potential GET liability and that the OTCs' discussions with the Department in 2007 and 2008 are

"legally irrelevant" and based upon "factual misrepresentations."  The Director contends that the penalties assessed by the Department are "prima facie correct in all respects" and that the burden is on the taxpayer to overcome the presumption of proper assessment.  Based upon the OTCs' failure to offer any evidence in support of that burden, the Director asserts that the tax court correctly affirmed the penalties assessed by the Director on the unpaid GET.  The Director further disputes that the failure to pay penalty cannot be imposed absent an affirmative determination by the Director that a failure to pay was due to negligence or intentional disregard of rules.

### E.    Discussion of the GET

The GET is imposed on the gross income derived from the sale of services or rental income resulting from all services activities that occur within the state.  HRS § 237-13.

### 1.    The Assessed Transactions are subject to the GET

This court has previously stated that the GET statute "evidences the intention of the legislature to tax every form of business, subject to its taxing jurisdiction, not specifically exempted from its provisions."  Grayco, 57 Haw. at 443, 559 P.2d at 270.  In enacting the GET, "the legislature cast a wide and tight net."  In re Tax Appeal of Island Holidays, Ltd., 59 Haw. 307, 316, 582 P.2d 703, 708 (1978); see In re Tax Appeal of C.

Brewer & Co., 65 Haw. 240, 247, 649 P.2d 1155, 1156 (1982). "Read as a whole," the GET taxes "virtually every economic activity imaginable." Pratt v. Kondo, 53 Haw. 435, 436, 496 P.2d 1, 2 (1972); see C. Brewer & Co., 65 Haw. at 244, 649 P.2d at 1158 (noting that the legislative design was "to reach virtually all transactions with economic gain or benefit").

The GET is a privilege tax assessed "based on the privilege or activity of doing business within the State and not on the fact of domicile." Grayco, 57 Haw. at 447, 559 P.2d at 272. It "is a gross receipts tax on the privilege of doing business in Hawai'i." Baker & Taylor, 103 Hawai'i at 365, 82 P.3d at 810; accord Subway, 110 Hawai'i at 32, 129 P.3d at 535. "[I]t is a tax imposed upon entrepreneurs for the privilege of doing business" that "applies at all levels of economic activity from production or manufacturing to retailing . . . and to virtually all goods and services." In re Tax Appeal of Cent. Union Church Arcadia Ret. Residence, 63 Haw. 199, 202, 624 P.2d 1346, 1349 (1981). It is assessed when the taxpayer avails itself of the "protection, opportunities, and benefits" afforded by the State of Hawai'i. Heftel Broad., 57 Haw. at 182, 554 P.2d at 248 (emphasis added); accord Baker & Taylor, 103 Hawai'i at 365, 82 P.3d at 810.

The Director is not required to acquiesce to a taxpayer's chosen form of accounting practices and nominal

distinctions when making a determination of liability for taxation. "Though it may be axiomatic that a taxpayer can order its affairs in any manner not proscribed by law to minimize the impact of taxation, the Director is by no means bound by its accounting practices." C. Brewer & Co., 65 Haw. at 246, 649 P.2d at 1158-59 (citation omitted). "It is also fundamental that [the Director] can look at the substance rather than the form of a transaction in fixing tax liability." Id. "Actualities and consequences of a commercial transaction, rather than the method employed in doing business, are controlling factors in determining such liability." In re Taxes, Kobayashi, 44 Haw. 584, 590, 358 P.2d 539, 543 (1961). "To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation." Kobayashi, 44 Haw. at 590, 358 P.2d at 543 (quoting Higgins v. Smith, 308 U.S. 473, 477 (1940)).

The OTCs assert that the statutory phrase "in the state" means a "physical geographical limitation" and that Grayco, Subway, Baker & Taylor, and Heftel Broadcasting so hold. However, our case law does not support the contention that the taxpayer must have a physical presence in the state.

In Grayco, the taxpayer was a California corporation with its principal place of business in California. Grayco, 57 Haw. at 438, 559 P.2d at 267. The taxpayer was not licensed to

do business in Hawai'i pursuant to HRS Chapter 237, nor did it have a place of business or any employees in Hawai'i. Id. The taxpayer held legal title to land in Hawai'i as trustee for certain beneficial owners in California. Id. at 439, 559 P.2d at 269. The taxpayer executed agreements of sale in California for subdivided lots of the land in Hawai'i, received principal and interest payments in California, and distributed those payments to the beneficiaries. Id. at 441, 445, 559 P.2d at 269, 271. The Director assessed the taxpayer for the interest income. Id. at 442, 559 P.2d at 269.

This court found that the "initial and primary issue" in Grayco was whether the trustee, as legal title holder to and vendor of the subdivided property, was "engaging or continuing within the State in any business, trade or activity." Id. at 443, 559 P.2d at 270 (alteration omitted) (quoting HRS § 237-13(10)). We held, "It is clear that the taxable event in this case was the receipt of interest income derived from the sale of land located in Hawai'i under agreements of sale . . . ." Id. at 454, 559 P.2d at 276. Accordingly, we found there was sufficient business activity by the taxpayer in this State to justify the privilege tax. Id. at 449, 559 P.2d at 273. Additionally, we noted that the taxpayer benefited not only from roads, police and fire protection of the State, but also

utilized the State's recording offices, laws, courts, and "other opportunities, protection and benefits of the State."  Id.

Further, the Director in Grayco looked through the taxpayer's contractual edifice to assess the taxpayer.  "The fact that [the beneficial owner] is under a duty to pay all taxes assessed on the property pursuant to the trust agreement is . . . of no effect.  The trust agreement between the various parties is not binding on the taxing authority or determinative of the tax consequences."  Id. at 456, 559 P.2d at 277.  "To hold otherwise would create havoc for the taxing authorities."  Id.  Accordingly, this court found that the taxpayer, as trustee and legal owner of the property in question, was liable for the assessment of the general excise tax.

In Subway, the Director assessed the taxpayer for income arising from sublease agreements for properties located in Hawai'i.  Subway, 110 Hawai'i at 27, 129 P.3d at 530.  The taxpayer had no employees or offices in Hawai'i.  Id. at 31, 129 P.2d at 534.  Under the sublease agreement, all sublease rent was paid directly by the sublessee to the landlord; none of the income went to the sublessor taxpayer.  Id. at 27, 129 P.2d at 530.

Nonetheless, this court held that under the anticipatory assignment doctrine, the taxpayer could not "be excused from its liability for GET by channeling the sublease

payments directly to the landlords." Id. at 33, 129 P.2d at 536. "To permit Taxpayer to do so would directly subvert the overall scheme of HRS chapter 237 to tax 'all levels of economic activity.'" Id. (quoting Cent. Union Church, 63 Haw. at 202, 624 P.2d at 1349).

This court found that the subleasing taxpayer derived certain benefits, including, inter alia, the power to prohibit the landlord from leasing to competitors, the right to assign subleases without the landlord's consent, and the capacity to enforce provisions of the sublease agreement. Id. at 34, 129 P.2d at 537. Thus, we concluded that "inasmuch as [the t]axpayer gained or economically benefitted from the subleasing transactions at issue, . . . the Director's assessment and imposition of the GET for [the t]axpayer's subleasing activities was proper." Id.

In Baker & Taylor, a Delaware corporation, with its principal place of business in North Carolina, contracted to sell books and other education materials to Hawai'i customers. Baker & Taylor, 103 Hawai'i at 362, 82 P.3d at 807. Title to the books and other materials passed to the customer outside of Hawai'i. Id. The taxpayer had no office in Hawai'i, no employees based in Hawai'i, and no real property in Hawai'i. Id. at 361-62, 82 P.2d at 806-07. The taxpayer argued that as title to the goods passed outside of Hawai'i, the transactions were not

subject to the GET.  Id. at 364, 82 P.3d at 809.  This court disagreed.  Id. at 367, 82 P.3d at 812.

We found that the taxpayer was "not a passive seller of goods to Hawai'i consumers."  Id. at 366, 82 P.3d at 811. Rather, the taxpayer "engaged in active solicitation in Hawai'i by sending employee representatives to meet potential and current purchasers of its products."  Id. at 366, 82 P.3d at 811.  Further, the sales "were made pursuant to a contract that [the taxpayer] obtained through bidding with the State" for the business, and the taxpayer provided "software and training for purchasing and cataloging its materials in Hawai'i."  Id. Accordingly, we found that it was "evident that in engaging in such activity," the taxpayer received the "benefits and protection of the laws of the state, including the right to resort to the courts for the enforcement of its rights."  Id. (quoting Int'l Shoe Co. v. Wash., 326 U.S. 310, 320 (1945)). Thus, the court concluded there was "sufficient 'business and other activities in the State' to impose the general excise tax" on the sales transactions and that the taxpayer was liable for the GET assessed.  Id. at 367, 82 P.3d at 812.

In Heftel Broadcasting, the Director assessed the GET against out-of-state corporations that had license agreements providing telecast rights for films to a local corporation. Heftel Broad., 57 Haw. at 176, 554 P.2d at 244.  The out-of-

state corporations were not physically present in Hawaiʻi nor engaged in any activity in Hawaiʻi, other than owning and renting film prints and their telecast rights and shipping the films to the local corporation.  Id.  All of the licensing agreements were consummated outside of Hawaiʻi.  Id. at 177, 544 P.2d at 245.  The threshold issue was whether the transactions had taken place "in the State."  Id. at 179, 544 P.2d at 246.  This court concluded as follows:

> These telecast rights were wholly consumable and only consumable in Hawaii within specific time limits. . . . So even though the agreement was consummated on the mainland, it was done so with the intent that performance would occur almost entirely in Hawaii.  Furthermore, unlike a sale of goods that takes place on the mainland with the goods being transported here, the license arrangement continued into this State wherein it was a source of income to the licensor.

Id. at 180-81, 554 P.2d at 246-47 (emphases added) (footnotes omitted).  Thus, we were "of the opinion that regardless of the fact that all activities in the consummation of the agreement between the parties herein occurred on the mainland, [the taxpayer] was engaged in local 'business' within the meaning of chapter 237."  Id. at 181, 544 P.2d at 247.

Here, it is clear that the taxable event is the receipt of income by the OTCs under agreements with transients to provide accommodations in Hawaiʻi hotel rooms.  Like the taxpayer in Subway, the OTCs receive income by virtue of selling the right to occupy hotel rooms located in Hawaiʻi.  The OTCs

have previously contracted to have access to that right through the OTC-hotel contracts, in a manner analogous to the subleasor/subleasee agreements present in Subway.  As in Subway, the OTCs gain and economically benefit from the transactions at issue.  Just as transients are Hawai'i consumers when they purchase hotel rooms directly from a hotel, they remain Hawai'i consumers when they purchase a Hawai'i hotel room from an OTC.

As in Baker & Taylor, the OTCs are not passive sellers of services to Hawai'i consumers.  The OTCs actively solicit customers for Hawai'i hotel rooms and actively solicit hotels to contractually provide the right to sell on their website the right of occupancy of hotel rooms.

Similar to Heftel Broadcasting, it is clear the occupancy rights that the OTCs are selling to transients are wholly consumable and only consumable in Hawai'i.  Even though an OTC's agreement with a transient may take place outside of Hawai'i, the agreement is effected with the intent that performance would occur entirely in Hawai'i.  Further, the OTC-transient agreement, in which an OTC provides a Hawai'i hotel room to the transient, is similar to the licensing agreements in Heftel Broadcasting, in that the transient accommodation agreements continue into this State where it is a source of income to the OTCs.  Finally, it is clear that the OTCs

constructively benefit through the transients' use and benefit from state services--including use of the roads and access to police, fire, and lifeguard protection services.  Thus, it is inescapable that there are sufficient "business and other activities in the State" to impose the GET on the gross income resulting from the Assessed Transactions.[20]

### 2.    The GET Apportioning Provision applies to the Assessed Transactions

As noted, the GET "evidences the intention of the legislature to tax every form of business, subject to the taxing jurisdiction, not specifically exempted from its provisions." Grayco, 57 Haw. at 443, 559 P.2d at 270.  Similarly, the receipts of taxation are likewise described in expansive terms. Gross income means in relevant part:

> the gross receipts, cash or accrued, of the taxpayer received as compensation for personal services and the gross receipts of the taxpayer derived from trade, business, commerce, or sales and the value proceeding or accruing from the sale of tangible personal property, or service, or both, and all receipts, actual or accrued as hereinafter provided . . . .

HRS § 237-3 (1993) (emphasis added).  Thus, under the definition of gross income provided by HRS § 237-3, the GET would be assessed on the gross income received by the OTCs from the

---

[20]    In light of our opinion that the OTCs are liable for the GET, we do not address the OTCs' claim that it was error for the tax court to deny their motion for reconsideration of the order granting summary judgment in favor of the Director on the GET issue.  Further, as it is clear that the Assessed Transactions are business transactions that continue in the state, the OTCs' argument that their services are not "used or consumed in the State" is rejected.

transient for the provision of Hawai'i hotel rooms.  However, the

"inherent pervasiveness" of the GET, with its expansive

definition of income, is mitigated by limited categories of

income-reducing provisions.  Cent. Union Church, 63 Haw. at 202,

624 P.2d at 1349.  As stated previously, the GET Apportioning

Provision divides income between hotel operators and a "travel

agency and tour packager":

> Where transient accommodations are furnished through
> arrangements made by a travel agency or tour packager at
> noncommissioned negotiated contract rates and the gross
> income is divided between the operator of transient
> accommodations on the one hand and the travel agency or
> tour packager on the other hand, the tax imposed by this
> chapter shall apply to each such person with respect to
> such person's respective portion of the proceeds, and no
> more.

HRS § 237-18(g) (emphases added).[21]  Accordingly, if the income

resulting from the provision of the transient accommodation may

be divided between the hotel as "the operator of the transient

accommodation on the one hand" and the OTCs as the "travel agent

or tour packager on the other hand," then the GET may only be

imposed on the OTCs' "respective portion" of the gross income--

that is, the gross income less the "net rate."

However, for the GET Apportioning Provision to apply

to the Assessed Transactions, three requirements must be met.

---

[21]    It is undisputed that the hotels are "operators" under HRS §
237D-1 (1993).  See infra Part IV for discussion of HRS Chapter 237D, which
establishes the TAT.  It is also not a matter of dispute that the
accommodations provided in the Assessed Transactions are "transient
accommodations" as defined by HRS § 237D-1.

First, the OTCs must operate as a travel agency or tour packager in the Assessed Transaction. Second, the gross income resulting from the Assessed Transactions must be divided between the travel agency or tour packager and the operator. Third, the Assessed Transactions must furnish transient accommodations under noncommissioned contract rates.[22]

### a. The OTCs operate as travel agencies

Although the term "travel agency" is not defined within HRS Chapter 237 and has not been construed by our case law, this court applies the ordinary meaning of words. HRS § 1-14 (1985); Saranillio v. Silva, 78 Hawai'i 1, 10, 889 P.2d 685, 694 (1995). In the ordinary sense, an "agency" is "an establishment engaged in doing business for another," Webster's Third New International Dictionary 40 (unabr. 1993) [hereinafter Webster's], or "a business that provides a particular service."[23] "Travel agency" is "an office or enterprise engaged in selling, arranging, or furnishing information about personal transportation or travel." Webster's, supra, at 2433. A travel agency is "an agency engaged in selling and arranging

_____

[22] Regardless of the applicability of the GET Apportioning Provision to the Assessed Transactions, the hotels are liable for the GET on the net rate received by the hotels from the OTCs, which the parties do not dispute that the hotels should pay and have paid.

[23] Agency, Merriam-Webster, http://www.merriam-webster.com/dictionary/agency (last visited Aug. 20, 2014).

transportation, accommodations, tours and trips for travelers."[24]

Thus, the ordinary usage of "travel agency" as an enterprise

that "engages in doing business," "provides," or "sells" does

not preclude the travel agency from entering into direct

contractual privity with the traveler.  The activities of the

OTCs are therefore in accordance with the ordinary and commonly

understood meaning of "travel agency" as an enterprise engaged

in arranging and <u>selling</u> travel services.[25]

Even if the ordinary usage of "travel agency" is not

dispositive, <u>see</u> HRS § 1-14, and it is assumed to be ambiguous,

the meaning may be sought by examining the context within which

the words appear.  HRS § 1-15 (1985).  Here, the conclusion that

the OTCs perform as travel agencies is supported by examination

of this term in the context of the GET Apportioning Provision.

In context, the term "travel agency" is paired with

"tour packager"; accordingly, we look to the use of the term

"tour packager" to determine if it assists in the understanding

---

[24]     <u>Travel Agency</u>, Merriam-Webster, http://www.merriam-webster.com/dictionary/travel%20agency, (last visited Sept. 17, 2014).

[25]     This is in accord with the conclusion of the tax court in regards to the TAT.  The tax court concluded as follows:

> And I think that because there is no definition of "travel agency," that a common notion of travel agency is very close to what the OTCs performed.
>
> . . . . [W]hile there may be technical distinctions between a travel agency and an OTC, for the purpose of what our legislature was looking at, I viewed the term "travel agency" to be somewhat generic.

of "travel agencies."  The term "tour packager" is also not expressly defined by statute, nor is a definition provided by common dictionaries.

An aid to understanding the meaning of "tour packager" is provided by other definitions in the HRS and HAR.  For instance, the term "tour packager" appears within the definition of "carrier": a "carrier" is "a person who engages in transportation, and does not include a person such as a freight forwarder or <u>tour packager</u> who provides transportation by contracting with others, except to the extent that such person oneself engages in transportation."  HRS § 239-2 (Supp. 1998) (emphasis added) (defining "carrier").  Thus, under HRS § 239-2, a tour packager that provides a transient with transportation services is not precluded from entering into direct contractual privity with the transient.

Similarly, for purposes of the rental motor vehicle and tour vehicle tax, "a wholesaler, <u>tour packager</u>, or travel agent whose business and service may include arranging the rental vehicle transportation for a person shall not be deemed a lessor, unless the wholesaler, <u>tour packager</u>, or travel agent actually rents or leases (as defined in section 18-251-1-04) the vehicle."  HAR § 18-251-1-02(b) (effective 1992) (emphasis added).  Likewise, "tour vehicle operator" is defined to the exclusion of "wholesalers, <u>tour packagers</u>, and travel agents

whose business and service may include arranging the
transportation of persons via tour vehicles, unless the
wholesaler, tour packager, or travel agent owns, manages,
operates, or dispatches tour vehicles.  HAR 18-251-1-06(b)
(effective 1992 & 1993) (emphasis added).  Thus, the
Department's rules pertaining to the rental motor vehicle and
tour vehicle tax expressly contemplate that either a tour
packager or a travel agent may directly enter into contractual
privity with a transient seeking to rent or lease a vehicle.

A further aid in understanding the term "tour
packager" is provided by the Department's TIR 91-8, which
discusses the application of the GET Apportioning Provision and
provides the following example:

> Example 2 – A tour packager sells a tourist a tour of
> Honolulu for $50.  Included in this tour are stops at a
> pineapple cannery (cannery) and the Arizona Memorial
> Visitor Center (Visitor Center).  The tour packager pays a
> bus company $30 for transportation, pays the cannery $5 for
> a tour, and pays the Visitor Center $5 for admission to the
> Visitor Center.

TIR 91-8 at 2 (July 8, 1991) (emphasis added).[26]  TIR 91-8 goes
on to describe the tax effect of the various payments and the
amount that is taxed to the tour packager.  Id.  However, what
is significant is that because the tour packager makes all
payments to the vendors for the activities collectively sold to

---

[26]     The TIRs are available at http://tax.hawaii.gov/legal/tir.

the tourist, the TIR seems to describe an entity that is in direct contractual privity with the tourist.

Thus, the term "travel agency or tour packager" is not inconsistent with an entity, which is in direct contractual privity with a consumer of transient accommodations, from applying the GET Apportioning Provision to the proceeds derived from that contract.  It follows that the ordinary definition of travel agency, reinforced by the treatment of "tour packager" as that term is used in related statutes, the Department's rules, and the Department's published guidance, indicates that, for the purposes of the GET Apportioning Provision, the OTCs operate as travel agencies in the Assessed Transactions.  This conclusion is further sustained in the context of the analysis of "gross income is divided" and "noncommissioned negotiated contract rates."

### b.    The gross income resulting from the Assessed Transaction is divided

The second requirement for application of the GET Apportioning Provision is that the gross income is divided between the operator of transient accommodations on the one hand and the travel agency or tour packager on the other hand.

The term "divided" is not defined by statute.  Under general principles of statutory construction, courts endeavour to give words their ordinary meaning unless the statute requires

a different interpretation. HRS § 1-14; Saranillio, 78 Hawai'i at 10, 889 P.2d at 694. Further, if the term "divided" is ambiguous, "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it, may be considered to discover its true meaning." HRS § 1-15.

Dictionary definitions would indicate that the income resulting from the Assessed Transactions may be "divided." "Divide," as a verb, means "to separate into two or more parts." Webster's, supra, at 663. Thus, based on a dictionary definition of "divide," it does not appear that the term precludes application of the GET Apportioning Provision to the Assessed Transactions.

In context, the term "divided" or "gross income is divided" appears in five other subsections of HRS § 237-18, other than the GET Apportioning Provision set forth in subsection (g). See HRS § 237-18(a)-(b), (e)-(f), and (h) (2001). The legislative history for these subsections indicates that the legislature did not intend the verb "divide" to signify any type of unique accounting practice between the parties identified in each subsection. In the history of HRS § 237-18 and its precursors in the Laws of Hawai'i and the Revised Laws of Hawai'i, the first appearance of the term "divided" was in subsection (a), enacted in 1949, which offers special tax treatment for operators of coin-operated devices.

> Where a coin operated device produces <u>gross income which is divided</u> between the owner or operator of the device, on the one hand, and the owner or operator of the premises where the device is located, on the other hand, the tax imposed by this chapter shall apply to each such person with respect to the person's portion of the proceeds, and no more.

HRS § 237-18(a) (1993) (emphasis added). HRS § 237-18(a) serves the same purpose between an operator of a coin-operated device and the owner of the premises as does the GET Apportioning Provision between a travel agency and the hotel operator.

HRS § 237-18(a) has remained unchanged since its enactment. See 1949 Haw. Sess. Laws Act 252, § 1 at 300. The legislative history does not indicate that the legislature placed any special meaning on the term "divided."[27] Further, it seems likely that the relationship between the "owner or operator" of a coin operated device and the "owner or operator of the premises where the device is located" would have an arms-length, contractual relationship. Thus, in the context of HRS § 237-18(a), the phrase "gross income is divided" does not specify, require, or preclude a certain type of business relationship or revenue-division agreement.

---

[27] See S. Stand. Comm. Rep. No. 530, in 1949 Senate Journal, at 1368-69 ("This bill provides that in the case gross income from coin-operated machines is divided between the owner of the machine and the owner of the premises. . . ."); H. Stand. Comm. Rep. No. 926, in 1949 House Journal, at 2218 ("This bill provides that where the gross income derived from the operation of a coin operated device is divided between the owner or operator of such device, on the one hand, and the owner or operator of the premises where such device is located, on the other hand, the general excise tax shall . . . be imposed on each such person's portion of the proceeds . . . .").

The 1951 legislature added subsections (b) and (e) to HRS § 237-18. 1951 Haw. Sess. Laws Act 165, § 4 at 294-95. Subsection (b) addresses an entertainment venue where gate receipts are divided between the person furnishing or producing an event and the promoter.[28] Subsection (b) has a similar effect as the GET Apportioning Provision; although the promoter is responsible for the GET on the "whole of the proceeds," liability between the producer and the promoter is limited by subsection (b) to one application of the GET.

Subsection (e) concerns commissions by insurance agents or real estate brokers.

> Where insurance agents . . . or real estate brokers or salespersons . . . produce commissions which are divided between such general agents, subagents, or solicitors, or between such real estate brokers or salespersons . . . the tax levied . . . shall apply to each such person with respect to the person's portion of the commissions, and no more.

HRS § 237-18(e) (emphasis added). Thus, subsection (e) has generally the same purpose between insurance agents or real

---

[28] Subsection (b) provides:

> Where gate receipts or other admissions are divided between the person furnishing or producing a play, concert, lecture, athletic event, or similar spectacle . . . on the one hand, and a promoter . . . offering the spectacle to the public, on the other hand, the tax imposed by this chapter . . . shall apply only to the promoter measured by the whole of the proceeds, and the promoter shall be authorized to deduct and withhold from the portion of the proceeds payable to the person furnishing or producing the spectacle the amount of the tax payable by the person upon such portion.

HRS § 237-18(b) (emphasis added).

estate agents as does subsection (g) between a travel agency and the hotel operator.

The legislative history for the 1951 amendment does not indicate that the legislature placed any unique or special meaning on the term "divided," but it does indicate that the legislature found the term synonymous with "split" or "splitting."[29]  Thus, the 1951 amendment provided two significantly different economic relationships--a promoter/producer relationship and a relationship between insurance agents or between real estate brokers--and defined both categories of relationships as "dividing" or "splitting" their income.

Subsection (f) provides special GET treatment for "tourism related services":[30]

---

[29]     The report of the House Standing Committee stated that the 1951 amendment "relat[ed] to the splitting of gate receipts" and the "splitting of commissions between insurance agents or between real estate brokers."  H. Stand. Comm. Rep. No. 369, in 1951 House Journal, at 501.  The House Committee also indicated the 1951 amendment addressed the situation when an insurance agent "receiv[ed] part of a commission."  Id.  Similarly, the Senate Committee Report noted, "The bill relates to the application of the [GET] to commissions split between real estate brokers, or between insurance agents, gate receipts or other admissions split between promoters and performers . . . ."  S. Stand. Comm. Rep. No. 394, in 1951 Senate Journal, at 893.

[30]     "Tourism related services" means:

    catamaran cruises, canoe rides, dinner cruises, lei greetings, transportation included in a tour package, sightseeing tours not subject to chapter 239, admissions to luaus, dinner shows, extravaganzas, cultural and educational facilities, and other services rendered directly to the customer or tourist, but only if the providers of the services other than air transportation are

                                                    (continued. . .)

> Where tourism related services are furnished through
> arrangements made by a travel agency or tour packager and
> the gross income is divided between the provider of the
> services and the travel agency or tour packager, the tax
> imposed by this chapter shall apply to each such person
> with respect to such person's respective portion of the
> proceeds, and no more.

HRS § 237-18(f) (emphasis added).  Subsection (f) has the same

purpose between a travel agency and a provider of tourism

related services, as does subsection (g) between a travel agency

and the hotel operator.  Subsection (f) was added in 1986 to

prevent the Department from "grossing up"[31] the income of

tourism-related service providers.

> Your Committee after reviewing the law in this area agrees,
> with reservation, that under the reasoning of the general
> excise tax law the need for a gross up provision or the
> ability to gross up is required.  On the other hand, the
> use of gross up in the area of certain tourism-related
> services does not serve the interests of the State in
> encouraging tourism. . . .  This amendment provides for a
> split of the gross proceeds from tourism-related services
> between the travel agency or tour packager and the tour
> provider.  For example, if the tour provider furnished
> tickets to the travel agency for $80 which normally sell
> for $100, the tour provider will only be taxed on the $80
> received.  The travel agency or tour packager will be taxed
> on the commission it receives.

Conf. Comm. Rep. No. 70-86, in 1986 House Journal, at 962, 1986

Senate Journal, at 765-66 (emphases added).  Thus, when HRS §

---

(. . .continued)

> subject to a four per cent tax under this chapter or
> chapter 239.

HRS § 237-18(f).

[31]     "Gross up" or "grossing up" is not defined by statute or in the
legislative history.  In context, it appears to mean the practice of the
Department to assess an entity for the GET on imputed income for certain
transactions that is greater than the income resulting from the transaction
reported by the taxpaying entity.

237-18 was amended to add subsection (f), the legislature

recognized a class of transactions between travel agencies and

providers of tourism-related services that it wanted to provide

preferential tax treatment, and the use of the term "gross

income is divided" did not connote any unique type of business

relationship or accounting practice.

Subsection (h) of HRS § 237-18 addresses

transportation services.

> Where the transportation of passengers or property is furnished through arrangements between motor carriers, and the gross income is divided between the motor carriers, any tax imposed by this chapter shall apply to each motor carrier with respect to each motor carrier's respective portion of the proceeds.

HRS § 237-18(h) (2001) (emphasis added).  This section was added

in a special session of the legislature following the terrorist

attacks of September 11, 2001.  2001 Haw. 3rd Spec. Sess. Laws

Act 9, § 3 at 28-29.[32]

> Your committee finds that the visitor industry's significant contributions to Hawaii's economy have been dealt a severe blow as a result of the aftermath of the terrorist[] actions of September 11, 2001.  If Hawaii's visitor industry is to recover in a timely manner, immediate action must be taken to increase the marketing of Hawaiʻi as a preferred destination.

H. Stand. Comm. Rep. No. 3, in 2001 3rd Spec. Sess. Senate

Journal, at 100; S. Stand. Comm. Rep. No. 3, in 2001 3rd Spec.

_____

[32]    The legislative history does not specifically discuss the addition of subsection (h) but notes that the bill was designed to "support the State of Hawaii as a visitor destination."  H. Stand. Comm. Rep. No. 3, in 2001 3rd Spec. Sess. Senate Journal, at 100; S. Stand. Comm. Rep. No. 3, in 2001 3rd Spec. Sess. Senate Journal, at 53.

Sess. Senate Journal, at 53. Thus, the legislature identified transportation as an element of the Hawai'i visitor industry that needed protection and provided special tax treatment to motor carriers that divide income derived from the collaborative transportation of passengers or property.

Based on the variety of situations and business relationships set forth by the subsections of HRS § 237-18 in which "gross" or other income "is divided," the phrase "gross income is divided" merely signifies that there must be an economic transaction between the two entities identified by the subsections of HRS § 237-18 in which income derived from that transaction is shared or otherwise split. That is, when entities identified within HRS § 237-18 subsections (a), (b), (e), (f), (g), or (h) participate in an economic transaction of the type therein described and the income derived from that transaction is split between these entities, the entities' income is divided.

Guidance provided by the Department also indicates that a vendor-vendee relationship is not precluded from "dividing" income, as contended by the Director. Example Two of TIR 91-8, discussed supra, does not express whether the tour packager is in an arm's-length transaction with the cannery, bus company, and the Visitor Center or whether the tour packager is in some type of joint venture or partnership, but in context, an

arm's-length transaction seems more plausible. See TIR 91-8 at 2. Thus, the tour packager in Example Two "divided" its "income" for purposes of income-dividing under HRS § 237-18(g), notwithstanding that the transactions are at arm's length, standard retail transactions.

The first example in TIR 91-8 produces a similar conclusion:

> Example 1 – XYZ Travel, a Hawai'i corporation based in Honolulu assembles package tours consisting of air travel from the mainland to Hawai'i, a lei greeting, ground transportation from the airport to the hotel, hotel accommodations, certain meals, and admissions from independent vendors and suppliers, paying vendors and suppliers a total of $500 per customer or tourist.

TIR 91-8 at 1. Example 1 goes on to state that XYZ Travel resells the package for $600 and that XYZ Travel is liable for GET on its $100 profit. Id. However, the example does not suggest that XYZ Travel is in a joint venture or partnership with each of the other parties involved in the transaction.

Thus, the phrase "gross income is divided" in HRS § 237-18(g) identifies an economic transaction between the OTC and the hotel in which accommodations are provided to a transient and the income from that transaction is shared or split between the hotel and the OTC.[33] Thus, in the Assessed Transactions,

---

[33] Further, the record indicates that the OTC's purchase of the right to transfer occupancy to the transient and the transfer of that right to the transient is effectively a simultaneous transaction. Thus, the Director's argument that the OTCs do not divide income with hotels "by virtue of paying the hotels for room occupancy later sold to transients," is not

(continued. . .)

gross income is divided, as that term is used in the GET Apportioning Provision.

Further, HRS § 237-18 illustrates the legislature's intent to protect certain categories of business transactions from the pyramiding effect of the GET and thus adds to the understanding of the term "travel agencies."  Notably, the legislature repeatedly sought to protect tourism-related industries in three separate provisions: tourism-related services in HRS § 237-18(f), the furnishing of transient accommodations in subsection (g), and the furnishing of transportation services by motor carriers in subsection (h).[34] In light of the special tax treatment that the legislature sought to provide to transactions between travel agencies and hotel operators in HRS § 237-18(g), the term "travel agency" should not be given a constrained interpretation that would frustrate the legislative intent to protect the tourism industry.

---

(. . .continued)

determinative of the applicability of the GET Apportioning Provision to the Assessed Transactions.

[34]     Other industries the legislature sought to provide special tax treatment include sugar cane hauling and harvesting.  HRS § 237-18(d).

**c.   The Assessed Transactions supply transient accommodations at noncommissioned negotiated contract rates**

Finally, in order to qualify for the GET Apportioning Provision, the Assessed Transactions must supply transient accommodations under noncommissioned contract rates.  The definition of noncommissioned negotiated contract rates is also not provided by HRS § 237-18(g).  It is clear that the room rates are specified by contract, and the parties do not dispute that the rates were negotiated.  Thus, the disputed term would appear to be "noncommissioned."

A "commission" is normally understood to be a "fee paid to an agent or employee for a particular transaction, usu[ally] as a percentage of the money received by the transaction."  Black's Law Dictionary 327 (10th ed. 2014).  A "noncommissioned" rate, then, would suggest an amount of money paid to an entity or person other than an agent or an employee.  It would seem to be dispositive that the OTCs did not function as an agent or employees of the hotels in the Assessed Transactions to find that the rate is "noncommissioned."

The legislative history of the GET Apportioning Provision provides additional guidance.  The GET Apportioning Provision was originally added to HRS § 237-18 in 1988.  See 1988 Haw. Sess. Laws. Act 167, § 1 at 293.  In explaining the

addition, the conference committee report defined the problem
the legislation was intended to address.

> Your Committee finds that in the case of the tour packager
> and the operator of transient accommodations, in many
> instances the tour packager blocks out a number of rooms
> and acts as a wholesaler of those rooms to the members of
> the tour.  The tour packager packages the rooms as part of
> a tour which may include ground transportation, meals, and
> entertainment.  Although it is clear that the tour packager
> is in business to make money, neither the operator of
> transient accommodations or others involved in the tour
> know what the mark-up of the tour packager is.  <u>In these
> instances the Department . . . is imposing the general
> excise tax on the operator based on the cost of the room
> and not on the price for which the operator sold the rooms
> to the tour packager</u>.

Conf. Comm. Rep. 94-88, in 1988 House Journal, at 803, 1988
Senate Journal, at 698 (emphasis added).  Thus, the problem
identified by the legislature was that the GET was imposed on
the operator for the marked-up cost of a room, even though the
hotel did not know what the marked-up cost was.  The committee
report explains that the Department based this tax imposition on
its treatment of a roughly analogous situation: a commissioned
transaction.

> [I]n the case of transient accommodations, the cost of
> commissions is attributable to the gross income of the
> operator without deduction.  In a commission operation the
> hotel may offer a 10 per cent commission to a travel agent.
> The hotel then may collect $100 from the agent and return
> $10 to the agent or the agent may collect $100 and return
> only $90 to the hotel.  In both situations the hotel must
> pay the general excise tax on the $100 room rental.  <u>Both
> the hotel industry and the department agree that this is
> proper</u>.

<u>Id.</u> (emphasis added).  However, when the transaction was not
commissioned and the hotel could not know the actual room rate

charged to the transient, the committee found that treatment

unfair:

> In the case before your Committee in this bill, the hotel does not know what the actual price the $100 room is sold for by the tour packager.  The rooms may be sold to the tour packager for $90 and the tour packager may resell the rooms for $90, $100, or any price in between or even less than $90.  Many of the largest tour packagers operate out of New York and Japan, and the hotel industry has no means of knowing what the mark-up of these packagers is.  The Department . . . is grossing up the revenues of the hotel to $100 in the preceding example, by treating this as a commission operation.  In this instance, it appears unfair for the [D]epartment to gross up the amount of revenue received by the hotels, and your Committee finds that this bill will solve that problem and disallow gross up in this instance.

Id. (emphases added).

To summarize, the Conference Committee Report

indicates that when hotels paid an agent for the room on a

commission basis, the room rate was readily definable, and all

the parties agreed that it was "proper" for the hotel to pay the

GET on the gross room rate.  But in the case of a

noncommissioned tour packager, the hotel had "no means of

knowing" what the packager's mark-up was, and thus it was

undetermined what the actual room rate was.  Under these

circumstances, the committee found it was "unfair" for the

Department to charge the GET on the "grossed up" room rate.

Viewed in the context of its legislative history, the GET

Apportioning Provision appears to have been implemented in part

to protect hotels from paying the GET on a higher room rate than

could be conveniently demonstrated that the transient had

actually paid.  Instead, GET liability is placed on "each . . . person with respect to such person's respective portions."  HRS § 237-18(g).  Thus, the GET Apportioning Provision protects persons who meet its requirements from paying the tax on more than their share of the proceeds received from providing transient accommodations.

This case is analogous to the situation envisioned by the 1988 legislature in which the "rooms may be sold to the tour packager for $90 and the tour packager may resell the rooms for $90, $100."  Conf. Comm. Rep. 94-88, in 1988 House Journal, at 803, 1988 Senate Journal, at 698.  Here, the OTCs purchase the right to sell the right of occupancy to a transient, complete the sale to a transient, and the hotels have "no means of knowing" what the OTCs' mark-up is.  It is undisputed that the hotels are not providing the OTCs with a commission; rather, the hotels receive payment according to their contract with the OTCs for the rooms rented after they invoice the OTCs.  Thus, the OTCs provide transient accommodations at noncommissioned negotiated contract rates.[35]

_____

[35]    In postulating that "tour packagers" bought and then sold the room, the committee report indicates that contractual privity can exist between transient and a travel agent or tour packager seeking to apply the GET Apportioning Provision.  See Conf. Comm. Rep. 94-88, in 1988 House Journal, at 803, 1988 Senate Journal, at 698.

### d.   Summary of the elements of the GET Apportioning Provision

The Assessed Transactions meet each of the three elements of the GET Apportioning Provision.  Thus, HRS § 237-18(g) applies to the Assessed Transactions such that the GET is assessable on the gross income of each person providing transient accommodations in accordance with the respective portion of the proceeds of each.[36]  Accordingly, when travel agencies and hotel operators contract to provide transient accommodations to a transient, the GET Apportioning Provision provides that the GET is imposed on the travel agency and hotel operator on the respective portion of the gross income allocated or distributed to each, and no more.[37]

---

[36]     Although the tax court declined to make findings of fact or conclusions of law, the court reasoned that the GET Apportioning Provision did not apply to the Assessed Transaction because the contractual rate was variable and because, as the OTCs added the mark-up and service fee, value was added to the transaction; thus, in adding value to the transaction, the OTCs fell within the intent of the GET to pyramid.  However, a "noncommissioned negotiated contract rate" is not restricted to a fixed rate, the income received by the OTCs and the hotels in the Assessed Transactions is consistent with a "noncommissioned negotiated contract rates" inasmuch as the income is not a commission and is according to rates under contracts that are negotiated, and the legislative history of the GET Apportioning Provision indicates the provision's applicability.  Thus, the tax court's analysis in this regard is in error.

[37]     The OTCs have conceded that their respective portion of the gross proceeds includes both the margin and their service fee, arguing that if the GET Apportioning Provision applies to the Assessed Transaction, "GET liability would . . . extend to the amount the OTC retains, i.e., its margin and service fee."

### F.    Penalties on the GET Assessments

### 1.    Failure to file

The "failure to file" penalty is authorized by HRS

§ 231-39(b)(1), which provides, in relevant part:

> In case of failure to file any tax return required to be filed on the date prescribed therefor . . . unless it is shown that the failure is <u>due to reasonable cause and not due to neglect</u>, there shall be added to the amount required to be shown as tax on the return . . . not exceeding twenty-five per cent in the aggregate.

HRS § 231-39(b)(1) (Supp. 1994) (emphasis added).  "Thus, it is

clear that the penalty is to be imposed unless the failure to

file is 'due to reasonable cause and not due to neglect.'"

<u>Grayco</u>, 57 Haw. at 457, 559 P.2d at 278.  "'Reasonable cause'

has been interpreted to mean no more than the exercise of

ordinary business care and prudence.  However, a mere showing of

absence of willful neglect is insufficient to avoid the

penalty."  <u>Id.</u> (citations omitted).  "The issue is one of fact

and the burden of proving reasonable cause is on the taxpayer."

<u>Id.</u>; <u>see also</u> <u>In re Tax Appeal of E-Z Serve, Inc.</u>, 65 Haw. 283,

284, 651 P.2d 469, 470 (1982) (stating that the failure to file

penalty "is a matter which turns on a finding of fact").  A

finding of fact will not be overturned on appeal unless it is

clearly erroneous.  <u>Diamond v. Dobbin</u>, 132 Hawai'i 9, 24, 319

P.3d 1017, 1032 (2014).

To meet its burden of proof in regard to a failure to

file, "appellants must show the presence of other supporting

circumstances, in addition to its honest belief, that it was not responsible for the tax." Grayco, 57 Haw. at 459, 559 P.2d at 278-79. "It is generally recognized that the presence of certain factors, in addition to the honest belief of the taxpayer, constitutes reasonable cause for the failure to file a return, e.g., the advice of a competent accountant or attorney; or reliance on the statements of an [agent of the taxing authority]." Id. at 459, 559 P.2d at 279 (emphasis added) (citations omitted). Thus, there must be both "other supporting circumstances" and "honest belief." In Grayco, the taxpayer contended that it was justified in failing to file a return because it reasonably believed that it was not responsible for the tax and that tax liability was uncertain. Id. at 458, 559 P.2d at 278. Grayco held, "Absent reliance on competent counsel or the Director or his representative, Grayco's erroneous belief that it had no taxable income that would necessitate the filing of a return, was not reasonable cause." Id. at 459, 559 P.2d at 279 (emphasis added).

Here, the tax court determined the OTCs failed to demonstrate a fact that indicated a dispute as to whether they were required to file GET returns and the OTCs failed to demonstrate that they were aware of any Department or AG letter, opinion, or communication to the contrary. The determination of the tax court that the OTCs failed to meet their burden to

demonstrate their honest belief that they were not responsible for filing GET returns was not clearly erroneous and is therefore affirmed.

However, as the failure to file penalty was assessed on the gross income resulting from the Assessed Transactions without application of the GET Apportioning Provision, the actual dollar award is clearly erroneous and must be recalculated based on each OTC's respective portion of the gross income derived from providing transient accommodations, as apportioned under HRS § 237-18(g).

### 2. Failure to pay

The "failure to pay" penalty is authorized by HRS § 231-39(b)(2)(A), which provides in relevant part:

> If any part of any underpayment is <u>due to negligence or intentional disregard of rules</u> (but without intent to defraud), there shall be added to the tax an amount up to twenty-five per cent of the underpayment as determined by the director.

HRS § 231-39(b)(2)(A) (emphasis added). While it is clear that "there shall be added" a failure to pay penalty, it is not clear from the statute whether the Director must affirmatively demonstrate the existence of such negligence or intentional disregard, or whether the taxpayer seeking to avoid the penalty must show that the failure was not due to negligence or

- 63 -

intentional disregard of the rules.[38]  In contrast, in the

"failure to file" provision, discussed supra, the burden on the

taxpayer is made clear by the language that "unless it is shown

that the failure is due to reasonable cause and not due to

neglect, there shall be added" a penalty.  HRS § 231-39(b)(1)

(emphasis added).

The Director implies the application of the failure to

pay penalty is mandatory and asserts the provision implies

discretion as to the amount of the underpayment penalty, not as

to whether to apply the penalty or whether negligence or

intentional disregard of the rules was present.

However, whether or not the imposition of the failure

to pay penalty is mandatory is irrelevant in this case because

once made, the assessment enjoys a presumption of validity.

> Irrespective of which party prevails in proceedings before
> a state board of review, or any equivalent administrative
> body established by county ordinance, the assessment as
> made by the assessor, or if increased by the board, or
> equivalent county administrative body, the assessment as so
> increased, shall be deemed prima facie correct.

HRS § 232-13 (1993) (emphasis added); see also In re Tax Appeal

of Valley of Temples Corp., 56 Haw. 229, 232, 533 P.2d 1218,

---

[38]    The failure to pay penalty was originally enacted in 1967 as an amendment to Revised Laws of Hawaiʻi (RLH) § 115-43.  See 1967 Haw. Sess. Laws, Act 134, § 1, at 123-34, HRS Tables of Disposition, at 11.  The committee reports related to 1967 Act 134 do not make any statements relevant to assigning the burden to show or disprove negligence or intentional disregard of the rules.  See H. Stand. Comm. Rep. No. 916, in 1967 House Journal, at 835; S. Stand. Comm. Rep. No. 644, in 1967 Senate Journal, at 1144.

1220 (1975) ("The assessment made by the State's assessor is deemed to be prima facie correct.").

An assessment is a "[d]etermination of the rate or amount of something, such as a tax or damages" or the "[i]mposition of something, such as a tax or fine, according to an established rate; the tax or fine so imposed." Black's Law Dictionary, supra, at 139. Thus, the term "assessment" is equivalent to a determined and imposed tax. HRS § 231-39(b) provides that interest and penalties "shall be added to and become a part of the tax imposed by such tax or revenue law, and collected as such." HRS § 231-39(b) (emphases added). Thus, HRS § 231-39 is a taxing statute and the application of interest and penalties is an assessment. In re Taxes Maui Agric. Co., 34 Haw. 515, 531 (Haw. Terr. 1938) (discussing the effect of a taxpayer refusing or neglecting to file a real property tax return and stating, "And in any such case a penalty . . . is imposed to be added by the assessor to the amount of any assessment made by him, which penalty becomes a part of the assessment." (emphasis added)).[39]

---

[39] That interest and penalties are part of the "assessment" is consistent with federal law. Section 6201 of the Internal Revenue Code defines the Internal Revenue Service's (IRS's) authority for assessment and collection of taxes to include civil penalties. The IRS is specifically required to assess "all taxes (including interest, additional amounts, additions to the tax, and assessable penalties) imposed by this title." 26 U.S.C. § 6201(a) (2010).

In light of the statutory mandate that the Department's assessments are prima facie correct, it is clear that the legislature intended an evidentiary presumption that the failure to pay was due to negligence or intentional disregard of the rules by the taxpayer,[40] and it is the taxpayer's burden to prove otherwise. As such, the assessments of the Department, including penalties for failure to pay due to negligence or intentional disregard of the rules, are prima facie correct and the burden is on the taxpayer to prove otherwise.

The Director's assessments enjoy a presumption of validity that places the burden on the taxpayer seeking to avoid the failure to pay penalty to prove that such failure was <u>not</u> due to negligence or intentional disregard of the rules. Therefore, "assessment notices, lists, and records are deemed to be prima facie proof that assessments were determined in compliance with carefully prescribed procedures." <u>Valley of Temples</u>, 56 Haw. at 232, 533 P.2d at 1220. "In attacking [an assessment], we are mindful that the taxpayers have the burden to show clearly the invalidity claimed by overcoming the presumption that the tax assessor has faithfully performed his

---

[40] We express no opinion as to the respective burdens of the Director and the taxpayer when the Director asserts that the failure to pay was due to fraud. <u>See</u> HRS § 232-19(b)(2)(B).

duty." In re Taxes of Ewa Plantation Co., 47 Haw. 41, 50-51, 384 P.2d 287, 292 (1963).

The OTCs do not argue that they presented any evidence rebutting the presumption of negligence or establishing a genuine issue of material fact that would preclude summary judgment, nor do they point to any such evidence in the record. Thus, the determination of the tax court that "there are no genuine issues of material facts on the question of penalties for failure to pay general excise taxes" was not clearly erroneous and is therefore affirmed.

However, as the failure to pay penalty was assessed on the gross income resulting from the Assessed Transactions without application of the GET Apportioning Provision, the actual dollar award is clearly erroneous, and the case is remanded for recalculation based on each OTC's respective portion of the gross income of the Assessed Transactions, as apportioned under HRS § 237-18(g).

IV.     DISCUSSION OF THE TAT ASSESSMENTS

A.     Introduction

The TAT is imposed by HRS Chapter 237D; HRS § 237-2 provides as follows:

> (a) There is levied and shall be assessed and collected each month a tax of:
>
> . . .
>
> (3)   7.25 per cent for the period beginning on January 1, 1999, and thereafter; on the gross rental or

> gross rental proceeds derived from <u>furnishing</u>
> transient accommodations.
>
> (b)  <u>Every operator</u> shall pay to the State the tax imposed
>      by subsection (a), as provided in this chapter.

HRS § 237D-2 (Supp. 1998) (emphases added).  Thus, the TAT is
assessed on the "gross rental or gross rental proceeds," (Gross
Rental Proceeds) derived from furnishing transient
accommodations and is payable by "operators."

In their motions for summary judgment, both the
Director and the OTCs made arguments regarding the assessment of
the TAT upon the Assessed Transactions, and, separately, the
assessment of a "failure to file" penalty and a "failure to pay"
penalty.

**B.  The tax court's in-court statements regarding the TAT Assessments**

At the summary judgment hearing, the tax court heard
arguments and made statements regarding the TAT.[41]  The court
first analyzed the statutory definition of operator:

> "<u>Operator</u>" means <u>any person</u> operating a transient
> accommodation, whether as owner or proprietor or as lessee,
> sublessee, mortgagee in possession, licensee, or otherwise,
> or <u>engaging</u> or continuing <u>in any service business</u> which
> <u>involves</u> the <u>actual furnishing</u> of transient accommodation.

HRS § 237D-1 (1993).  The tax court recognized two definitions
provided by the statute.

---

[41]  The tax court did not make findings of fact or conclusions of
law, pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 52(a).

Under the first definition, the tax court examined the terms "owner, proprietor, lessee, sublessee, mortgagee in possession, [or] licensee."  The court observed that these are "all individuals or entities that have some form of ownership interest."  Thus, the court found that the "first half of the operator definition deal[s] with entities who have some type of ownership interest."

Under the second statutory definition, the court found that the reference to "engaging or continuing in any service business which involves the actual furnishing of transient accommodation" signified that the operator was "a non-owner or some entity or person that does not have an ownership interest but has another connection to the property."

The court found that the TAT was enacted to tax the tourist industry and that the OTCs were "travel agents." Accordingly, the lack of a "connection" to the hotel property indicated to the tax court that the OTCs were not operators.

The court further examined the operation of an apportioning provision within the definition of Gross Rental Proceeds (TAT Apportioning Provision).  The TAT Apportioning Provision provides as follows:

> Where transient accommodations are furnished through arrangements made by a travel agency or tour packager at noncommissionable negotiated contract rates and the gross income is divided between the operator of transient accommodations on the one hand and the travel agency or tour packager on the other hand, . . . [G]ross [R]ental

> [P]roceeds to the operator means only the respective portion allocated or distributed to the operator, and no more.

HRS § 237D-1. The court found that the TAT did not "envision" pyramiding because the legislature split the gross revenues between a travel agency and an operator and specified that revenues that were assessable for the TAT meant only the respective portions "allocated or distributed to" the operator.

The tax court concluded that the TAT only applied to the net rate that is distributed to the hotels. Based on that conclusion, the tax court granted the motion for summary judgment filed by the OTCs and denied the motion filed by the Director. The court reiterated its conclusion when it denied the Director's motion for reconsideration: "[T]he hotel as an operator under the TAT law pays the TAT on the revenue the hotel generates for transient accommodations. No pyramiding is permitted under the law. The OTCs are not hotel operators and therefore are not subject to TAT . . . ." Thus, influenced in part by its reading of the TAT Apportioning Provision, the tax court found that the OTCs were not operators.

### C. The parties' TAT arguments on appeal

The Director appeals the tax court's grant of summary judgment in favor of the OTCs on the issue of the OTCs' liability for GET, the court's denial of reconsideration of that

grant, and the court's denial of the Director's motion for reconsideration.

**1.    The Director's arguments regarding the TAT Assessments**

The Director argues that the OTCs function as TAT "operators" and are subject to the TAT on all proceeds received from transients.

**a. The Director argues that as TAT "operators," the OTCs are liable for the TAT**

The Director argues that the OTCs are liable for the TAT because they function as "TAT operators."  The Director focuses on the definition of the word operator:

> "<u>Operator</u>" means <u>any person</u> operating a transient accommodation, whether as owner or proprietor or as lessee, sublessee, mortgagee in possession, licensee, or otherwise, or <u>engaging</u> or continuing <u>in any service business</u> which <u>involves</u> the <u>actual furnishing</u> of transient accommodation.

HRS § 237D-1 (emphases added).  The Director contends that the OTCs function as TAT "operators" under the second definition by "engaging or continuing in any service business which involves the actual furnishing of transient accommodations."

The Director maintains that the legislature chose a "very broad definition" of operator for the TAT and "rejected a narrow 'operate or manage' definition it used elsewhere."  The Director asserts that the verb "involves" is important because, as with "operator," the "legislature chose a very broad and

expansive term."[42]  The Director claims that the activities of the OTCs are all functions "that hotels would traditionally perform themselves in furnishing their hotel rooms to transients."  The Director argues that as "parties to the rental contract with the transient," the OTCs are "extensively 'involved in the actual furnishing' of hotel rooms" and the "hotel does not have any involvement in the consumer transaction."

The Director further argues that this court and others have broadly construed the key term "furnishing."  Citing to Territory v. Hu Seong, 20 Haw. 669 (Haw. Terr. 1911), the Director contends that "'furnish' is a comprehensive term and includes many different ways by which an article may be supplied or delivered by one person to another."  The Director cites to cases from other jurisdictions involving a hotel room tax in which the OTCs were defendants that the Director contends interpreted "furnishing" in a similarly expansive manner in favor of the taxing authority.

---

[42]    The Director cites eleven activities conducted by the OTCs as constituting involvement: (1) furnishing transients the contractual right to occupy hotel rooms, (2) being the Merchant of Record on the credit card transaction, (3) setting the price of the room, (4) operating a vast hotel reservation network, (5) advertising and marketing the availability of hotel rooms, (6) entering into legal contracts with hotels and transients, (7) collecting tax and rental payments from transients, (8) assuming the risk of bad debts, (9) issuing transaction receipts to transients, (10) processing cancellations and refunds, and (11) providing 24-hour customer support "and more."

According to the Director, "the TAT statute, [HAR], and Hawai'i case law make clear that 'actual' furnishing refers to services that are provided which lead to 'actual occupancy' of accommodations as opposed to fees received in lieu of occupancy, such as cancellation fees, or services incidental to occupancy (such as food and beverage)." The Director maintains that an interpretation of the word "actual" to be "the person who really delivers and hands over the accommodations to the transient" would "render[] meaningless the second half of the 'operator' definition since it would be redundant of the first half."

b.  **The Director argues that all proceeds the OTCs received from transients are subject to the TAT**

The Director next examines the definition of the term Gross Rental Proceeds to conclude that "the OTC does not get to deduct the amount it pays the hotel pursuant to the OTC-Hotel Contracts when determining the OTC's TAT liability." The Director observes that the term "gross receipts" has been held to mean "'all receipts' with no deductions, as opposed to 'net receipts,'" and the TAT applies to the compensation the OTCs receive for the "furnishing of" transient accommodations.

The Director states that "HRS § 237D-2 currently levies a 9.25% TAT 'on the [Gross Rental Proceeds] derived from furnishing transient accommodations.'" The Director contends

that--analogous to the legislature's use of the expansive term "involves" in the definition of "operator"--the use of the term "derives" in the imposition of the tax is also expansive. The Director reasons that the TAT "is imposed upon the gross proceeds 'derived' from transient accommodations" and "[g]ross proceeds would include the total price the transient pays the OTCs for the right to occupy the room."

Second, the Director argues that the "well-established . . . pyramiding of taxes in Hawai'i" indicates that "the TAT statute underscores that there can be two operators for a single hotel stay." The Director maintains that the TAT statute "plainly and unambiguously imposes the tax on 'every operator' (not 'the operator') and defines operator as meaning 'any person' (not 'the person') involved in the actual furnishing of transient accommodations." The Director contends that, in the Assessed Transactions, "both the OTCs (under the second half of the 'operator' definition) and the hotel (under the first half) are operators,' and each is independently subject to TAT."

Lastly, the Director notes again that the TAT and GET statutes are in pari materia and therefore the TAT "taxes 'operators' such as the OTCs for the 'gross' amounts they receive from transients 'without any deductions' and regardless of any tax payments remitted to the State by the hotels to satisfy the hotels' separate tax obligations."

**2.    The OTCs' arguments regarding the TAT Assessment**

In response, the OTCs make the following arguments: they are not operators of hotels, and therefore they are not subject to the TAT; their compensation is not Gross Rental Proceeds "derived from actually furnishing transient accommodations" and thus not subject to the TAT; and ambiguities in the TAT statute must be construed in their favor.

**a.    The OTCs argue they are not 'operators' of hotels**

The OTCs contend that HRS § 237D-2 imposes the TAT "only on 'operators' of hotels" engaged in a business "which involves the actual furnishing of transient accommodation."  The OTCs reason that "to be an 'operator,' one must be able to transfer possession of hotel rooms to travelers, whether as one who has . . . possession of [] the hotel . . ., or as one who otherwise engages in a business that 'involves the actual furnishing' of rooms."

The OTCs contend that "actually furnishing" accommodations means to "physically deliver possession of a hotel room."  "[T]o actually furnish something means considerably more than just furnishing. . . . It [i]s like in the capacity of handing someone a key.  [That person would be] actually furnishing it."  The OTCs argue that this interpretation of "operator" is confirmed by the definition of "gross proceeds": "by . . . expressly limiting TAT liability to

only the portion allocated to the operator, and not the portion allocated to the travel agency." The OTCs contend that they are "'travel agencies' under Hawai'i law" and thus not subject to the TAT.

The OTCs also maintain this interpretation of "operator" is supported by the Department's rules. The OTCs assert that the rules specifically reject that term's "[a]pplication to travel agents." The OTCs conclude that the "TAT Statute and Rules both confirm that the 'operator' of a transient accommodation must be one who physically possesses the property." The OTCs argue that because they are not operators, they are not subject to the TAT. The OTCs contend they act "only as an intermediary between the traveler and the hotel."

**b.** **The OTCs argue that the Director misinterprets the TAT statute to improperly expand its scope**

The OTCs contend that the Director misconstrues the TAT statute to incorrectly extend its reach. First, the OTCs argue that the Director improperly expands the TAT from being assessable against "a business which involves the actual furnishing of transient accommodations" to assess any business that is involved in a process that leads to the furnishing of transient accommodations by a third party. Second, the OTCs argue the Director's "notion of multiple operators," is contrary to "all governing authority." Third, the OTCs dispute the

Director's reliance on statutes and court decisions from other jurisdictions. Lastly, the OTCs conclude that there is no evidence to establish that they actually furnish transient accommodations.

### c. The OTCs argue that a statutory definition of "travel agent" confirms that they are not operators

In a separate argument as to why the OTCs are not operators as that term is defined by the TAT, the OTCs contend a statutory definition of "travel agent" confirms that they are not operators. The OTCs claim that the record establishes that the OTCs act as intermediaries. "[T]he TAT's definition of [Gross Rental Proceeds] expressly acknowledges that a 'travel agency' remains a 'travel agency' when operating" on a noncommissioned basis. Thus, the OTCs conclude that a travel agency is not transformed into an operator.

### d. The OTCs argue their income is not Gross Rental Proceeds

The OTCs state that the TAT can only be imposed on Gross Rental Proceeds derived from furnishing transient accommodations. The OTCs maintain that their compensation is for their "online services" and not for the furnishing of transient accommodations.

Additionally, the OTCs contend that the TAT is not a "pyramiding tax." The OTCs argue that the Director's claim that "the TAT is a pyramiding tax . . . fails to cite any authority

for that assertion . . . [and] rests on the bald assertion that the TAT is modeled after the GET and the GET is considered a pyramiding tax." The OTCs argue the TAT statute expressly applies to only one entity--the operator of the hotel that actually furnishes the transient accommodations.

### e. The OTCs argue ambiguities in the TAT statute must be construed in their favor

Lastly, the OTCs argue that their construction of the TAT is reasonable. Therefore, even if the Director's construction were also reasonable, "any ambiguity in a taxing statute must be strictly construed against the taxing authority and in favor of the taxpayer."

### D. Discussion of the TAT

The TAT is imposed by HRS Chapter 237D; HRS § 237-2 provides as follows:

> (b) There is levied and shall be assessed and collected each month a tax of:
>
> . . .
>
> (3)  7.25 per cent for the period beginning on January 1, 1999, and thereafter; on the gross rental or gross rental proceeds derived from <u>furnishing</u> transient accommodations.
>
> (b)  <u>Every operator</u> shall pay to the State the tax imposed by subsection (a), as provided in this chapter.

HRS § 237D-2 (emphases added).  Thus, the TAT is assessed on the Gross Rental Proceeds[43] derived from furnishing transient accommodations and is payable by "operators."

1.  **"Actual" within the definition of "operators" is ambiguous**

The OTCs are liable for the TAT on Gross Rental Proceeds derived from the Assessed Transactions if they are "operators" under HRS § 237D-2(b).  An "operator" is "any person operating a transient accommodation, whether as owner or proprietor or as lessee, sublessee, mortgagee in possession, licensee, or otherwise, or <u>engaging or continuing in any service business which involves the actual furnishing of transient accommodation</u>."  HRS § 237D-1 (emphasis added).

Thus, the statute provides for two types of operators. It is not disputed that the OTCs are not owners or proprietors of any of the hotels in the Assessed Transactions, nor do the

---

[43]     "Gross Rental Proceeds" means

gross receipts, cash or accrued, of the taxpayer received as compensation for the furnishing of transient accommodations and the value proceeding or accruing from the furnishing of such accommodations without any deductions on account of the cost of property or services sold, the cost of materials used, labor cost, taxes, royalties, interest, discounts, or any other expenses whatsoever. . . .

The words [Gross Rental Proceeds] shall not be construed to include the amounts of taxes imposed by chapter 237 or this chapter on operators of transient accommodations and passed on, collected, and received from the consumer as part of the receipts received as compensation for the furnishing of transient accommodations.

HRS § 237D-1.

OTCs acts as lessee, sublessee, mortgagee in possession, or licensee of any hotel. Therefore, the first statutory definition of operator does not apply to the OTCs.

An operator may also be any person "engaging or continuing in any service business which involves the actual furnishing of transient accommodation." Id. (emphasis added). It is undisputed the OTCs are engaging or continuing in their respective service businesses. Thus, the only remaining question is whether, in the Assessed Transactions, the OTCs are "involve[d] [in] the actual furnishing of transient accommodation." Id.

As relevant to the Assessed Transactions, "transient accommodations" means:

> the furnishing of a room, apartment, suite, or the like which is customarily occupied by a transient for less than one-hundred eighty consecutive days for each letting by a hotel, apartment hotel, motel, condominium property regime or apartment . . . that provides living quarters, sleeping, or housekeeping accommodations, or other place in which lodgings are regularly furnished to transients for consideration.

Id. The parties do not dispute that the accommodations in the Assessed Transactions are transient accommodations.

"Involve" means "to draw in as a participant: Engage, Employ" or "to oblige, to become associated: Embroil, Entangle, Implicate." Webster's, supra, at 1191. It also means "to include as a necessary circumstance, condition, or consequence; imply; entail." The Random House College Dictionary 703 (rev.

unabr. ed. 1979) [hereinafter Random House].  Thus, an entity is "involved" in the "actual furnishing of transient accommodations" if it is drawn in as a participant, or included as a necessary circumstance, to the actual furnishing of transient accommodations.

The term "furnish" means "to provide or supply with what is needed, useful, or desirable: Equip."  Webster's, supra, at 923; see also Random House, supra, at 536 (defining "furnish" as "to provide or supply").  In Hu Seong, this court held that "the word 'furnish' is a comprehensive term and includes many different ways by which an article may be supplied or delivered by one person to and accepted by another."[44]  20 Haw. at 671. Thus, the TAT statute contemplates that the operator must engage or continue in a service business that delivers or provides transient accommodations.

It is plain that the OTCS are "involved" in "furnishing" transient accommodations.  That is, the OTCs are both drawn in as participants and included as a necessary circumstance in the Assessed Transactions, and they engage or

_____

[44]    Hu Seong found that the term encompassed "supply," "provide," "shipment" and "delivery," "sale and delivery," "provide for use," "to give away," "to let one have," "to sell," "to find," to "obtain or procure," but would not encompass "a sale without actual delivery."  Hu Seong, 20 Haw. at 671.

continue in a service business that delivers or provides

transient accommodations in the Assessed Transactions.

However, the TAT definition of operator also includes

the term "actual."  That is, the business must involve the

"actual furnishing of transient accommodation."  HRS § 237D-1

(emphasis added).  "Actual" means "[e]xisting in fact, real."

Black's Law Dictionary, supra, at 42.  "Existence in fact" and

"realness" would seem to be an inherent quality of being

involved in the furnishing of transient accommodations, but if

that were true, "actual" would be superfluous.  "Actual" might

also imply some physical presence,[45] but the entity operating the

physical premises is not dispositive.  For example, the

Department's rules would appear to continue to assess the TAT on

the owner-operator of the transient accommodation, even if a

management company directed the day-to-day operations from the

premises.[46]

---

[45]  Physical presence appears to be analogous to the use of the term "actual" in a related statute; HRS § 486K-1 defines a "Hotelkeeper" or "keeper" to includes "any individual, firm, or corporation actually operating a hotel."  HRS § 486K-1 (1993)  (emphasis added).

[46]  The Department's rules that define "operator" provide the following illustrations:

> Example 1.  Mr. Paul owns three apartment units and is engaged in the activity of furnishing transient accommodations.  As owner and operator, Mr. Paul is liable for the tax imposed by this chapter.
>
> Example 2.  The facts are the same as in Example 1, except that Mr. Paul engages XYZ Corporation, a firm engaged in the property management business, to manage and rent out
>
> (continued. . .)

Therefore, the term "actual" is ambiguous in the context of the definition of operator.

## 2. Defining "actual"

This court presumes that every word of a statutory definition has meaning and effect; therefore, we must look to sources other than the plain meaning of the statute in order to determine the meaning of "actual" within the definition of operator. Camara v. Agsalud, 67 Haw. 212, 215-16, 685 P.2d 794, 797 (1984).

Where the words of a law are ambiguous, this court examines the context in which the ambiguous words are placed, and examines the reason and spirit of the law and the cause that induced the legislature to enact it.[47] HRS § 1-15; McKnight, 131 Hawai'i at 388, 319 P.3d at 307.

_____

(. . .continued)

> the apartment units. Although the apartments are managed and rented out by XYZ Corporation, as the owner operator, Mr. Paul is liable for the tax imposed by this chapter.

HAR § 18-237D-1-05(c) (effective 1988) (emphasis added).

[47] It is recognized that "a cardinal rule of construction [is] that a statute imposing taxes is to be construed strictly against the government and in favor of the taxpayers and that no person and no property is to be included within its scope unless placed there by clear language of the statute." In re Tax Appeal of Hawaiian Tel. Co., 61 Haw. 572, 578, 608 P.2d 383, 388 (1980). However, the rule of strict construction with regard to taxing statutes is resorted to only "as an aid to construction when an ambiguity or doubt is apparent on the face of the statute, and then only after other possible extrinsic aids of construction available to resolve the ambiguity have been exhausted." Bishop Trust Co. v. Burns, 46 Haw. 375, 399-400, 381 P.2d 687, 701 (1963). Based on our resolution of the meaning of "actual," we do not resort to the rule of strict construction with regard to taxing statutes.

### a. Legislative intent of the TAT

The TAT was created by the legislature in 1986.  See 1986 Haw. Sess. Laws. Act 340, § 1 at 758-64.  The legislative history indicates that the legislature enacted the TAT in order to recompense the counties for infrastructure costs incurred by tourists and visitors that are borne by the counties.  The Conference Committee Report on H.B. 2508-86, the bill enacting the TAT, stated as follows: "It is the intent of your Committee that a portion of such revenues be appropriated for the promotion, stimulation and development of visitor assistance programs which may include . . . grants to the counties for the construction of recreational and other infrastructure to enhance visitor satisfaction."  Conf. Comm. Rep. No. 70-86, 1986 House Journal, at 962; No.66-86 1986 Senate Journal, at 765.  The legislature noted that the distribution of tax revenues generated by the TAT would "assist the industry and the counties."  S. Stand. Comm. Rep. No. 651-86, in 1986 Senate Journal, at 1076.

Comments made by the legislators state this purpose more clearly.  "[W]e have provided as a direct result of revenues to be realized by [the TAT], additional funds in the budget for tourism promotion and grants-in-aid to the counties." 1986 House Journal, at 828 (statement of Rep. Kiyabu).  "The bill that finally emerged from the Conference Committee would

provide money that can be made available to the counties to improve tourist-related infrastructure."  1986 House Journal, at 830 (statement of Rep. Pfiel).

> Each year, more than a million visitors -- a population equal to or greater than the number of residents in Hawaii -- use our roads, our parks, our water, and every other public facility and service, and in my estimation, without paying their "fair share" of the cost. . . .  In effect, only half of those making demands on government services are paying the taxes which make those services possible. Simply, that has not been fair.

1986 House Journal, at 828 (statement of Rep. Kamali'i) (emphasis added).  The legislature reconfirmed this purpose in 1990:[48]

> Your Committee also notes that tourism is the largest industry in Hawaii, and many of the burdens imposed by tourism falls on the counties.  Increased pressures of the visitor industry mean greater demands on county services. Many of the costs of providing, maintaining, and upgrading police and fire protection, parks, beaches, water, roads, sewage systems, and other tourism related infrastructure are being borne by the counties.
>
> Upon further consideration, your Committee has amended this bill in order to share the TAT revenues with the counties.

Conf. Comm. Rep. No. 207, 1990 House Journal, at 845, 1990 Senate Journal, at 845-46 (emphasis added).  Thus, the legislature determined the cost borne by the counties should be recovered by a tax imposed on tourists:

> Since 1959 when Hawaii became a state of our union we have had the people of the State of Hawaii carry the burden in making improvements for the infrastructure of all the counties through real property taxes, state income taxes, other revenue measures that tax the people of the State of

---

[48]    See 1990 Haw. Sess. Laws Act 185, §§ 1-4, at 394-96.  Act 185 amended HRS Chapter 237D to provide for an exact percentage distribution to the Counties and amended the requirements for returns and payments.  These amendments are not relevant to the current discussion.  Act 185 also amended the definition of Gross Rental Proceeds to exclude the imposition of the TAT itself, as discussed, infra.

> Hawaii and the people of this state have carried the burden of improving the State of Hawaii in every area so that we can allow our visitors who come to Hawaii to enjoy the amenities that we now have at the present time.  And we pledge to continue to improve our infrastructure our amenities so that more people can come to Hawaii.
>
> The 5 percent is the additional tax we are considering for the rooms.  I believe that this is a fair burden of taxes that must be shouldered by our visitors who visit the State of Hawaii.
>
> . . .
>
> I think it is fair for the visitors to help shoulder the burden with the rest of the people of the state.  The people of the state have given us a message that now is the time to levy a room tax of some kind . . . .

1986 Senate Journal, at 654-55 (statement of Sen. Yamasaki) (emphases added).

The mechanism that the legislature determined would be most appropriate was referred to as a "hotel room tax."  See 1986 House Journal, at 826 (statement of Rep. Ikeda) (referring to the TAT as a "hotel room tax"); id. at 828 (statement of Rep. Kamali'i) (same); id. at 830 (statement of Rep. Pfiel) (same); id. at 830 (statement of Rep. Isbell) ("[I]t should be very clear that it is the room itself that has a 5% charge to the tourist . . . ."); see also 1986 Senate Journal, at 652, 658 (statements of Sen. Soares) (referring to a "hotel room tax" and a "tourist tax"); id. at 655 (statement of Sen. Yamasaki) (referring to "the additional tax we are considering for the rooms"); id. at 655-58 (statements of Sens. Kawasaki and Cobb) (referring to a "tourist tax"); id. at 657 (statement of Sen. Abercrombie) (referring to "a hotel room tax, a tourist tax").

The legislative history indicates that the "hotel room tax" was not a tax on the hotels, but instead, was a mechanism to tax visitors by assessing the cost of their hotel room to correlate to costs associated with visitor use of infrastructure and county services.

### i.     Intent is reflected in the structure chosen for the tax

The intent of the legislature to tax transient visitors through the mechanism of a hotel room tax is reflected in the structure of the tax that was developed.  The TAT was originally proposed not as a separate tax, but as a special rate and application of the GET.  See H. Stand. Comm. Rep. No. 586-86, 1986 House Journal, at 1260, 1261 (proposing to amend HRS § 237-13(6) to apply a nine percent GET on "the gross proceeds of sale or gross income received").  Critically, the proposal was later changed to a separate tax, styled as the TAT. See H.B. 2805-86 H.D.1, S.D.1, 13th Leg., Reg. Sess. (1986).

The reason given for the change from a special application of the GET to a separate TAT was to protect the hotel industry from excessive taxation.  The committee report for H.B. 2805-06 H.D.1, S.D.1 states as follows:

> The purpose of this bill is to provide for a general excise tax on transient accommodations of 9 per cent, and to amend the provisions concerning the application of the general excise tax to reimbursements.
>
> Your Committee agrees with the Committee on Finance of the House of Representatives that the time has come to impose a tax on transient accommodations; however, it does not agree that the rate should be as high as 9 per cent, nor that the

> vehicle for imposing the tax should be the general excise tax <u>but instead should be a separate tax</u>.
>
> <u>The reason for a separate tax on transient accommodations is to lessen the income loss of transient accommodation operators</u>. Presently, under the general excise tax, if a person prices an item at $100, the person generally charges $104 in order to pass on the 4 per cent general excise tax. However, the general excise tax is on gross collections, which means the person must pay 4 per cent on $104, or $4.16. This means that for every $100 transaction a person loses 16 cents. If the general excise tax itself was increased to 8 per cent, then on a $100 price, the person would charge $108, pay taxes on $108 or $8.64 in taxes, and lose 64 cents. <u>By creating a new transient accommodations tax</u> at a 4 per cent rate and <u>providing that the general excise tax passed on and collected is not included in the gross proceeds</u> which are taxed under this tax and similarly providing that the gross proceeds subject to the general excise tax do not include collections under the new tax, the amount of the loss is reduced to 32 cents per $100— total tax paid of $8.32 composed of the general excise tax of $4.16 and the transient accommodations tax of $4.16. The savings under the two tax system to the industry is appreciable for businesses making thousands of dollars a year. <u>In this manner, the State is able to tax the industry for the benefit of the State, while at the same time minimizing the impact of the tax on the industry</u>.

S. Stand. Comm. Rep. No. 651-86, 1986 Senate Journal, at 1076 (emphases added); <u>see also</u> Conf. Comm. Rep. No. 70-86, 1986 House Journal, at 961-62, 1986 Senate Journal, at 764-65 (echoing much of the same language). Thus, the legislative history of the TAT indicates the intent to "minimiz[e] the impact of the tax" on the hotel and visitor industries. S. Stand. Comm. Rep. No. 651-86, 1986 Senate Journal, at 1076.

Comments during debate on the measure reinforce this conclusion. "This bill imposes a separate tax of 5% on tourist accommodations charges. <u>In this way, the tax does not fall on the corporate hotel industry or pyramid in its collection</u>. It

is a simple and clean tax."  1986 House Journal, at 828

(statement of Rep. Kamaliʻi) (emphasis added).

### ii.    Subsequent amendments indicate that the TAT is effectively a tax on net rental proceeds

The legislative history of the amendments indicates the legislature's continuing focus to minimize the impact of the tax on Hawaiʻi visitors and the hotel industry.

The TAT, originally enacted in 1986, 1986 Haw. Sess. Laws. Act 340, § 1 at 758-63, was amended to include the TAT Apportioning Provision in 1988.  See 1988 Haw. Sess. Laws Act 241, § 2 at 424-25.  The legislature did not provide explicit statements explaining its intent in enacting the TAT Apportioning Provision.  However, the GET and TAT Apportioning Provisions, although passed in different bills, were passed in the same session of the Hawaiʻi legislature.  See 1988 Haw. Sess Laws Act 167, § 1 at 292-93 (amending the GET); Act 241, § 2 at 424-25 (amending the TAT).

The Committee reports for Act 241, amending the TAT, indicate that the "application of the [TAT] is presently patterned after the [GET]."  H. Stand. Comm. Rep. No. 198, 1987 House Journal, at 1178.  Similarly, when the legislature amended the GET to include the GET Apportioning Provision codified at HRS § 237-18(g), the senate committee stated, "Your Committee finds that this bill provides equitable treatment for operators

of transient accommodations under the general excise tax law."
S. Stand. Comm. Rep. No., 914, in 1987 Senate Journal, at 1286.
The GET Apportioning Provision expressly references the TAT
Apportioning Provision: "As used in this subsection, the words
'transient accommodations' and 'operator' shall be defined in
the same manner as they are defined in section 237D-1."  HRS
§ 237-18(g).

Based on the similar construction of the GET and TAT
Apportioning Provisions, enactment by the same legislature, and
recognition by the legislature of the parallels between the two,
it is clear that the legislature consciously crafted the two
provisions in conjunction with one another.  Accordingly, the
same purpose is attributed to the TAT Apportioning Provision as
was expressed by the legislature in its concurrent enactment of
the GET Apportioning Provision: to protect the hotel and visitor
industry from the TAT being unfairly assessed on grossed up
revenues.

In addition to adding the TAT Apportioning Provision,
Act 241 also specified that the Gross Rental Proceeds exclude
amounts charged for the GET.  See 1988 Haw. Sess. Laws. Act 241,
§ 2 at 424.  The exclusion of the GET from Gross Rental Proceeds
was intended to prevent additional taxation on the privilege of
doing business in Hawai'i.

> Your Committee believes that the charge for doing business in Hawaii is already imposed under the [GET] which is a tax on gross proceeds. It is already acknowledged that the [TAT] is an additional tax imposed on a particular type of activity. <u>Therefore, your Committee feels that the transient accommodations tax should not be imposed on the basis of the room charge plus any amount passed-on due to the . . . tax</u>.

H. Stand. Comm. Rep. No. 198, 1987 House Journal, at 1178 (emphasis added).

The definition of Gross Rental Proceeds was further amended in 1990 to specify that it excludes any amount collected for the TAT. <u>See</u> 1990 Haw. Sess. Laws. Act 185, §3 at 395. The Department objected to the exclusion of the TAT collected from the transient in calculating the TAT because of what the Department perceived as a transformation of the TAT into a tax on net room rate.

> [S]ection 3 of [the bill] provides that the words "gross rental" or "gross rental proceeds" shall not be construed to include the transient accommodations tax imposed upon and passed on by operators of transient accommodations to occupants thereof. This provision is contrary to the definition of such words provided under section 2 of [the bill]. <u>The proposal changes the entire concept of the [TAT] from that of a tax on gross rentals to a tax on net rentals</u>. It is clear from the committee reports of the 1986 Legislature that it meant to tax any passed-on tax as gross income. This provision should be deleted.

Department Testimony on S.B. No. 1712, S.D. 3, H.D. 1, Relating to Transient Accommodations (March 31, 1982) (emphasis added).

By enacting the 1988 and 1990 amendments to the definition of Gross Rental Proceeds, the legislature indicated that the TAT was not merely assessed on a gross room rate. By creating a TAT Apportioning Provision, the legislature made it

clear that, where a travel agency or tour packager had made the room arrangements for the transient, the TAT was not to be charged on the gross rate paid by the transient but only on the Gross Rental Proceeds allocated to or distributed to the operator. Further, the GET and the TAT were expressly excluded from the TAT calculation. Taken together, the amendments indicate that the TAT is a tax to be paid by the transient based only on the cost attributed to the hotel room that is allocated to the operator. That is, the TAT was to be based on a room rate paid by the transient and allocated to the operator, less any amount distributed to a travel agency or tour packager, and excluding any GET or TAT. Thus, notwithstanding that the nomenclature for the assessable proceeds--"Gross Rental" or "Gross Rental Proceeds"--remained unchanged, the statutory definition excludes certain amounts.

With the intention of the legislature in mind, we turn to the TAT Apportioning Provision to determine how its operation might instruct this court's interpretation of "actual" within the definition of "operator."

b. **In context with the intent of the legislature, the TAT Apportioning Provision helps to define "operator"**

The exclusions contained within the definition of Gross Rental Proceeds include the TAT Apportioning Provision:

> Where transient accommodations are furnished through arrangements made by a travel agency or tour packager at noncommissionable negotiated contract rates and the <u>gross</u>

> income is divided between the operator of transient
> accommodations on the one hand and the travel agency or
> tour packager on the other hand, [Gross Rental Proceeds] to
> the operator means only the respective portion allocated or
> distributed to the operator, and no more.

HRS § 237D-1 (emphasis added). The elements of the TAT

Apportioning Provision are nearly identical to the elements of

the GET Apportioning Provision of HRS § 237-18(g).[49] As in the

GET, the operation of the TAT Apportioning Provision requires

the involvement of two entities: an "operator of transient

accommodations on the one hand and the travel agency or tour

packager on the other hand." Thus, a single entity cannot fill

both the role of operator of transient accommodations "on the

one hand" and the travel agency or tour packager "on the other

hand."

However, the TAT Apportioning Provision differs from

the GET Apportioning Provision in a crucial aspect. The GET

Apportioning Provision provides that "the tax imposed by this

chapter shall apply to each such person with respect to such

person's respective portion of the proceeds, and no more." HRS

§ 237-18(g) (emphasis added). That is, the GET Apportioning

Provision divides the taxable base into two portions and holds

"each" responsible party liable for their respective portion.

---

[49] In the elements of the GET and TAT Apportioning Provisions, the
only difference is that the GET Apportioning Provision refers to
"noncommissioned" negotiated contract rates, whereas the TAT Apportioning
Provision uses the term "noncommissionable." Based on the analysis to
follow, any difference in the meaning of the two terms is not relevant.

In contrast, the TAT Apportioning Provision defines the tax amount as "only the respective portion allocated or distributed to the operator, and no more."[50]  HRS § 237D-1 (emphasis added).  Thus, the TAT Apportioning Provision takes the gross amount paid by a transient and divides it into two portions: one assessable under the TAT, and one that is not.  As a result, whereas the GET Apportioning Provision holds both parties liable for the GET, the TAT Apportioning Provision provides that only the operator is liable for the TAT.

If the OTCs are operators, the OTCs cannot apply the TAT Apportioning Provision to split their Gross Rental Proceeds with the hotels.  This is because neither party has asserted the hotels are travel agents or tour packagers; thus, the hotels cannot fill the role of "travel agent or tour packager on the

---

[50]    The GET Apportioning Provision provides as follows:

> Where . . . the gross income is divided between the operator of transient accommodations on the one hand and the travel agency or tour packager on the other hand, the tax imposed by this chapter shall apply to each such person with respect to such person's respective portion of the proceeds, and no more.

HRS § 237-18(g) (emphasis added).  The TAT Apportioning Provision provides as follows:

> Where . . . the gross income is divided between the operator of transient accommodations on the one hand and the travel agency or tour packager on the other hand, [Gross Rental Proceeds] to the operator means only the respective portion allocated or distributed to the operator, and no more.

HRS § 237D-1 (emphasis added).

other hand." Hence, if an OTC is considered the "operator . . . on the one hand," then there is no legitimate entity to fill the position of "travel agency . . . on the other hand."

As stated by the Director, "Where there is no 'travel agent' in the transaction, as is the case in the [Assessed Transactions], the [TAT Apportioning Provision] does not apply." Because the elements of the TAT Apportioning Provision would not have been satisfied if the OTCs are operators, then the Assessed Transactions would not fall within the TAT Apportioning Provision. Accordingly, the entire amount paid to an OTC by a transient would be Gross Rental Proceeds subject to the TAT, except for the taxes already included.[51]

The parties do not dispute that the hotels owe the TAT on their Gross Rental Proceeds that derive from furnishing the transient accommodations in the Assessed Transactions.[52] Thus, if the meaning of "actual" within the definition of "operator" encompasses the OTCs, then the TAT would be assessed twice:

---

[51] As noted, the legislature enacted the TAT Apportioning Provision to protect operators who do not know the actual cost of the room charged to the transient. Here, the OTCs have actual knowledge of the cost charged to the transient; thus, the application of the TAT Apportioning Provision by an OTC would be inappropriate. Thus, application of the TAT Apportioning Provision to define the Gross Rental Proceeds of an OTC would also be contrary to the intent of the legislature for this additional reason.

[52] As stated by the Director, "Because they act as "operators" in [Assessed Transactions], the OTCs owe TAT on "gross rental proceeds . . . without any deductions." So too does the hotel on its "gross rental proceeds . . . . without any deductions" that it receives from the OTCs pursuant to the OTC-hotel Contracts." (Emphasis added).

first, against the OTCs based on the room rate plus the mark-up and service charges, and second, against the hotel on the net rate collected for the room.

The legislature determined that visitors should be assessed to pay for providing, maintaining, and upgrading county infrastructure and services. The primary justification for the TAT was to enable the visitor to pay to the state their "fair share" of the costs incurred by the county for providing infrastructure and services. 1986 House Journal, at 828 (statement of Rep. Kamali'i). The mechanism the legislature created for that purpose was a tax based on the transient's cost of the hotel room, limited to the proceeds allocated to the operator, to be remitted to the State by the transient's hotel. The TAT was designed to charge the visitor through the assessment against the cost of the hotel room; therefore, to more than double the TAT assessment would be contrary to the intent of the legislature that correlated the tax to the hotel room use. Plainly, the impact of a tourist's use of county infrastructure and services does not vary upon whether the room is booked through the OTC or through the hotel directly; the legislature did not intend that the TAT should be applied once or twice depending on the method the transient selected to reserve accommodations.

As stated, the legislature repeatedly demonstrated its intent to minimize the impact of the TAT on the tourist industry by taking the following steps: establishing the TAT in 1986 as a separate tax from the GET; amending the law in 1988 to include the TAT Apportioning Provision that assessed only the operator and not the travel agency or packager; excluded the GET from the definition of Gross Rental Proceeds so that the TAT would not be calculated based upon an amount that included the GET; and amending the TAT again in 1990 to ensure that the amount due was not calculated based on an amount that included the TAT charged. Together, the legislative history of the TAT demonstrates clear intent to preserve the TAT as a "simple and clean tax" that does not "fall on the corporate hotel industry or pyramid in its collection." 1986 House Journal, at 828 (statement of Rep. Kamali'i).

Considering that the legislature intended the TAT to be a tax upon the transient, assessed on the cost of a hotel room, and collected through the mechanism of the operator, it is clear that the legislature did not intend that the TAT would be assessed in full on multiple operators.

Thus, defining "actual" to mean "[e]xisting in fact" or "real," Black's Law Dictionary, supra, at 42, would result in double application of the TAT, contrary to the intent of the legislature. Consequently, the legislature must have intended a

different meaning for the term.  See McKnight, 131 Hawaiʻi at 388, 319 P.3d at 307 ("[W]e must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose." (quoting State v. Wells, 78 Hawaiʻi 373, 376, 894 P.2d 70, 73 (1995)).

### c. "Actual" indicates a single "operator"

Based on the continuing intent of the legislature to tax visitors for their use of county infrastructure and services by assessing the cost of transient accommodations that is allocated to the operator, to utilize the hotels as the vehicle for collecting that tax, and to minimize the impact of the TAT on the hotel and visitor industry, only a single taxable event as to the TAT occurs when a transient accommodation is furnished to a visitor.  It follows then, that a single operator is associated with the furnishing of transient accommodations. Applying the principle of pari materia, "actual" as part of "actually furnish," within the definition of operator, indicates a single entity as fulfilling this role.  Thus, an operator may be an "owner or proprietor or as lessee, sublessee, mortgagee in possession, licensee, or otherwise" or, if such person is not present, then the operator may be a person "engaging or continuing in any service business which involves the actual furnishing of transient accommodation[s]."  See HRS § 237D-1. The definition of operator in HRS § 237D-1 does not contemplate

or allow for multiple operators when a transient accommodation is furnished.

Here, the hotels in the Assessed Transactions are acknowledged by all parties to be an operator within the meaning of the use of that term as provided by HRS § 237D-1; thus, for purposes of the TAT Assessments, only the hotels are operators in the Assessed Transactions. Therefore, the OTCs are not operators and the TAT is not applicable to the OTCs in the Assessed Transactions.[53]

### E.    Penalties on the TAT Assessments

As we find that the OTCs are not operators, the determination of the tax court as to the TAT is affirmed, and the applicability of the penalties to the TAT Assessments is not presented.

### V.    CONCLUSION

The Final Judgment is affirmed in part and vacated in part, in accordance with the following:

> (1)    The Order Granting in Part and Continuing in Part [Director's] Motion for Partial Summary Judgment on [GET] Assessments, filed February 8, 2013, is affirmed in regard to the application of the GET and vacated in light of the application of the GET Apportioning Provision; the matter is remanded to the tax court for recalculation; and

---

[53]    In light of this conclusion, we do not specifically address the Director's fourth point of error. See supra note 4.

(2)   The Order Granting [Director's] Motion for
Partial Summary Judgment on [GET] Assessments;
Schedules 1-4, filed August 15, 2013, is affirmed
in regard to the application of the failure to
file and failure to pay penalties and vacated in
light of the application of the GET Apportioning
Provision; the matter is remanded to the tax
court for recalculation.

The Final Judgment is affirmed in all remaining

aspects, and the case is remanded to the tax court for further

proceedings consistent with this opinion.

| | |
|---|---|
| Paul Alston | /s/ Mark E. Recktenwald |
| Tina L. Colman | |
| Pamela W. Bunn | /s/ Paula A. Nakayama |
| Ronald I. Heller | |
| for Travelocity.com, L.P., | /s/ Sabrina S. McKenna |
| et al. | |
| | /s/ Richard W. Pollack |
| | |
| Hugh R. Jones | /s/ Randal K.O. Lee |
| Girard D. Lau | |
| Kimberly Tsumoto Guidry | |
| Warren Price III | |
| Kenneth T. Okamoto | |
| Robert A. Marks | |
| Gary Cruciani | |
| Steven D. Wolens | |
| for Director of Taxation, | |
| State of Hawaiʻi | |

